Kim HANSEN, Appellant,

v.

ROBERT HALF INTERNATIONAL, INC., Respondent.

No. A10–1558.

Supreme Court of Minnesota.

May 30, 2012.

Thomas A. Harder, Greta Bauer Reyes, Foley & Mansfield, PLLP, Minneapolis, MN, for appellant.

Dayle Nolan, Susan E. Tegt, Larkin, Hoffman, Daly & Lindgren, Ltd., Bloomington, MN, for respondent.

## OPINION

ANDERSON, G. BARRY, Justice.

This case involves an employment termination dispute in which appellant Kim Hansen challenges the district court's summary judgment determination that her employer, respondent Robert Half International, Inc. ("RHI"), did not violate the Minnesota Parenting Leave Act ("MPLA"), Minn.Stat. §§ 181.941–181.944 (2010), or the Minnesota Human Rights Act ("MHRA"), Minn.Stat. § 363A.08 (2010), when it terminated Hansen's employment shortly after she returned from maternity leave and failed to reinstate her to the same or a similar position. Because we agree that there are no genuine issues of material fact and that judgment is appropriate as a matter of law, we affirm.

*RHI's Business*

RHI is an international staffing service registered to do business in the State of Minnesota. Two of its divisions are Office Team and Robert Half Legal ("RHL"). RHL places lawyers, paralegals, law clerks, and legal support professionals on a temporary and permanent basis throughout the United States.

RHL's United States operations are divided into three zones: the Eastern Zone, the Central Zone, and the Western Zone. The Minneapolis office of RHL is in the Central Zone. The other offices in the Central Zone are in Chicago, Illinois; Dallas, Texas; Houston, Texas; Denver, Colorado; Columbus, Ohio; and Saint Louis, Missouri.

The Central Zone was supervised by the zone president, Bob Clark. Beginning in October 2008, Marilyn Bird managed the Central Zone operations of RHL as district director; she reported directly to Clark. Beginning in the fall of 2007, the branch manager of the Minneapolis office of RHL, who reported to Bird, was Amber Hennen. The division directors, who supervised teams of recruiting managers or account executives within the Minneapolis office, reported to Hennen. In April 2004, RHI hired appellant Kim Hansen as a staffing manager in the Office Team division. She held this position until 2006, when she was transferred to the RHL division as a member of the team that placed permanent candidates. Hennen was Hansen's direct supervisor from September 2007 until Hansen's position was eliminated in December 2008. Prior to the summer of 2008, Hennen was supervised by a regional manager, Jackie Moes. In the summer of 2008, the regional manager position was eliminated, and Moes joined RHI's management resources team.

Within the Minneapolis office of RHL, employees are assigned to the permanent placement team ("perm team") or temporary placement team ("temp team"). Recruiting managers are responsible for placement of permanent candidates, while account executives are responsible for placement of temporary employees. Due to the immediate nature of many of the temporary staffing requests, the temp team has less flexible work hours. Employees on the temp team are required to be present during normal office hours, from 7:30 a.m. until 5:30 p.m., and to stay after 5:30 p.m. if client needs necessitate it.

RHL evaluates the performance of employees on its perm team based on their production using monthly calculations known as "per desk average" ("PDA"). The PDA represents the total monthly production of each member, averaged over a number of months. An employee's "production" is comprised of the fees paid by entities using RHL's placement services. In general, perm team members who have been in their positions for at least 9 months are expected to have an average PDA of $25,000 each month. Employees are evaluated in relation to their PDA because their actual production numbers may fluctuate from month to month. Initially, new employees have lower billing expectations; RHL expects $30,000 in total billings from new employees in the first 3 months (i.e., $10,000 a month), then $20,000 per month for the next 4 to 8 months, then full production ($25,000) after 9 months.

Hansen testified that while the "expected PDA is $25,000," there is a "bottom line cutoff" of $16,000. Moes testified that she told Hansen that there was an absolute PDA baseline of roughly $16,000 or $17,000 required in order to avoid layoff at RHL.

*Hansen's Employment History*

On April 6, 2004, RHI hired Hansen as a staffing manager in the Office Team division. As a staffing manager, Hansen placed administrative professionals into temporary positions. She held this position until March 2006, when she requested a transfer to the RHL division after her return from maternity leave for the birth of her first child. Hansen requested the transfer because she wanted a reduced workday so that she could manage her child's daycare schedule. After this transfer, Hansen worked for RHL's perm team. In contrast to a typical member of the perm team who worked from 8:00 a.m. until 5:00 or 5:30 p.m., Hansen worked from 8:00 a.m. until 3:00 or 3:30 p.m. Despite Hansen's reduced schedule, she was expected to meet the same production goals as all other full-time employees of the perm team. Initially, Hansen was only responsible for recruiting candidates, not for marketing to clients. In the spring of 2007, Hansen became a recruiting manager after the resignation of another employee. Hansen inherited a book of business from the resigning employee, which increased her production numbers. Hansen's PDA in 2007 was approximately $26,811.74.

Hansen was promoted to division director around January 1, 2008. As a division director, Hansen was responsible for marketing to clients and placing candidates, as well as supervising the performance of others on the perm team. Soon after her promotion, Hansen's production numbers began to decline and were below what was expected from a division director. During the first quarter of 2008,

Hansen's PDA was the lowest on the perm team in the Minneapolis office, given her tenure.[1] Bird noticed that Hansen was underperforming in the division director role. Bird participated in frequent discussions with Clark, Moes, Hennen, and RHI's legal department regarding Hansen's underperformance throughout 2008. Additionally, Moes and Hennen held regular discussions with Hansen about her performance during the spring of 2008. In March 2008, Moes reduced the number of employees Hansen supervised so that Hansen could increase her personal production. Even after this reduction in responsibilities, Hansen's production numbers continued to decline; her production numbers for the months of March and April were $19,900 and $18,087, respectively, below the expected $25,000 PDA.

Due to Hansen's failure to increase her PDA, Moes made the decision to demote Hansen from her position as division director back to her role as recruiting manager. Hansen was not immediately replaced as division director, but ultimately Jessica Kuhl assumed this position.

After her return to the role of recruiting manager, Hansen's production numbers increased, although her second-quarter PDA of $22,522.58 was below the level expected of a recruiting manager with her experience. As of mid–2008, Hansen's PDA was $20,296.60. Consequently, her immediate supervisors, Hennen and Kuhl (who had taken over Hansen's role as division director by this time) met with Hansen to talk about her underperformance and to inform her that she needed to bill a minimum of $27,000 for the month of August.

1. Specifically, Hansen's PDA was $18,070, while Sarah Dunn and Jessica Kuhl, other members of the perm team, had PDAs of approximately $40,327 and $40,846, respectively. While Melissa Zollman's PDA of $11,342 was lower than Hansen's, Zollman did not join RHL until December 2007, and her production expectations were therefore lower.

Hansen's production numbers were $18,007.50 in July and $8,050.00 in August.

*Hansen's Pregnancy*

Hansen learned she was pregnant with her second child in late January 2008. Hennen learned of Hansen's pregnancy in January or February 2008. At some point, Hansen advised Hennen that her doctors suggested she might have medical complications related to the pregnancy. By the summer, Hansen began to experience pregnancy-related health problems. Hennen advised Hansen that she had the option of taking an early maternity leave to address any health issues related to her pregnancy, but Hansen did not accept the offer. Instead, Hansen worked part-time for the last 2 weeks of her pregnancy.

Hansen gave birth to her second child on August 29, 2008. Her leave of absence began that day. The leave of absence form completed and signed by Hansen selects "section A" as the type of leave that she was requesting. Section A is a request for "short-term medical disability," "pregnancy-related disability," or "worker's compensation disability" leave and states: "Note: Leave under FMLA runs concurrently with Short–Term Medical Leave." Hansen completed the line entitled "[p]regnancy-related disability" and filled in her delivery date.

RHI sent Hansen a letter dated September 11, 2008, confirming her leave as short term disability/FMLA leave and enclosing a copy of the leave of absence manual ("LOA manual"). The letter advised Hansen that she was eligible for up to 12 weeks of short term disability/FMLA leave in a 12 month period. Hansen was also advised that she could request a personal leave of up to 4 weeks at the conclusion of her short term disability/FMLA leave.

But she was also advised that an employee has "no guarantee of job reinstatement" at the "conclusion of a personal leave."

RHI has established policies regarding leaves of absence set out in its LOA manual. RHI provides a short term medical and pregnancy disability leave ("short term disability leave"),[2] described in part II, section 1 of the LOA manual. This leave is available to all full-time RHI employees starting on their first day of work. Employees are eligible for such leave if they are medically disabled and unable to work for more than five business days due to an "illness, injury, or disability or disability related to pregnancy/childbirth." The maximum amount of short term disability leave available under this policy is 12 weeks or the length of the employee's disability, whichever is less. RHI also provides leave under the FMLA, described in part II, section 2 of the LOA manual. In order to qualify for FMLA leave, employees must meet the requirements established by federal law and regulations.

Part III of the LOA manual, which addresses the interrelation of the various types of leave, states that if an employee is eligible for leave under the short term disability leave and FMLA, the employee's leave will be charged under both policies. This part of the LOA manual makes clear that short-term disability leave and FMLA leave run concurrently and that an employee is not entitled to more than 12 weeks of total leave under these policies in any given 12–month period.

Part I, section 9 of the LOA manual clearly advises employees about their right to reinstatement and specifically provides:

> Upon completion of an approved leave of absence an employee will be reinstated

---

**2.** Employees with at least 6 months of service with RHI are eligible to have all or part of their salary continued during a qualified short

term disability leave for the period of time that the employee is disabled according to a doctor's note.

to the employee's former position or a position that is substantially similar to the employee's former position without reduction in pay, benefits or service.

But reinstatement is not available if "the position or substantially similar position ceases to exist because of legitimate business reasons unrelated to the employee's leave."

Hansen returned to work on December 1, 2008, after completion of her approved leave of absence.

### The Economic Downturn

The economic downturn in the general economy that began in September 2008 severely affected RHL's business. The need for the company's staffing services decreased dramatically; RHL's monthly sales from permanent placements in the Central Zone decreased by more than 90% between August and December 2008. RHL's Central Zone business declined by more than 50% during this time period.

To account for the decrease in demand, Clark directed Bird to reduce the number of employees on the perm team within the Central Zone. Bird had sole discretion to determine which positions to eliminate. Hennen knew of general plans to reduce personnel in the Minneapolis office, but she was not involved in specific employment termination decisions. RHL reduced personnel on the perm team because the job order flow was significantly less than it had been before the economic downturn and RHL was producing less revenue.

From the fourth quarter of 2008 to the first quarter of 2009, Bird reduced the number of perm team employees in the Central Zone from 20 to 8. In January 2009 the perm teams in RHL's Columbus, Ohio and Saint Louis, Missouri offices were eliminated. In addition, the salaries of almost all perm team employees were reduced. The perm team in the Minne-apolis office was reduced from four employees to one employee. The only perm team employee who remained was Kuhl, who had the highest PDA for 2008.

### Hansen's Employment Termination

In determining which positions to eliminate, Bird compared total production from individual offices within the Central Zone, as well as the lowest performing employees within each of the offices. In comparing the performances of the relevant employees, she considered their production numbers for 2008, as well as their relative tenure with RHL. Bird decided to eliminate Hansen's position as part of this reduction in force. Bird chose to eliminate Hansen's position because, given her tenure, Hansen's PDA was consistently the lowest of all employees on the perm team in the Minneapolis office and the Central Zone during 2008. Kuhl was retained on the perm team because she had the highest PDA for 2008, $30,413. In comparison Hansen's PDA for 2008 was $18,479, and Sarah Dunn's PDA for 2008 was $23,524. In calculating Hansen's PDA for 2008, Bird did not evaluate Hansen's performance while she was on maternity leave.

Hennen did not make the decision to terminate Hansen, although she was informed of Bird's decision-making and knew it was possible that Hansen's position might be eliminated. It was not until December 2, 2008, that Bird informed Hennen that Hansen's position was being eliminated. Once Bird had notified Hennen that Hansen's position had been eliminated, Hennen met with Hansen around lunchtime on December 2, 2008, and informed Hansen that her job had been eliminated.

### Litigation

Hansen subsequently brought suit against RHI and asserted the following claims: (1) RHI violated the MPLA by failing to reinstate her to her position or a

comparable position after her maternity leave; (2) RHI violated the MPLA by retaliating against her for taking maternity leave; and (3) RHI violated the MHRA by terminating her because of her sex. At the close of discovery, RHI moved for summary judgment on all counts, and Hansen moved for partial summary judgment on her failure to reinstate claim. The district court granted RHI's motion in full and denied Hansen's motion. Regarding Hansen's first claim, the court concluded that Hansen had no right to reinstatement under the MPLA because the MPLA requires employees to request leave specifically under the MPLA, and Hansen failed to do so. The court also found that Hansen was terminated as a result of a bona fide reduction in force, which eliminated her reinstatement rights by operation of Minn.Stat. § 181.942, subd. 1(b). Regarding Hansen's second claim, the court held that Hansen did not have a proper retaliatory-discharge claim under the MPLA. In reaching this conclusion, the district court determined that Hansen failed to plead such a claim in her amended complaint and that RHI established a legitimate non-discriminatory reason for Hansen's termination, defeating Hansen's retaliation claim as a matter of law. The court also dismissed Hansen's claim of sex discrimination under the MHRA, concluding that Hansen failed to establish a prima facie case of sex discrimination; because Hansen's position was eliminated as part of a bona fide reduction in force, she had the burden of showing that her sex was a factor in the decision to eliminate her position, and she failed to meet that burden. The court of appeals affirmed the district court's grant of summary judgment. This appeal followed.

## I.

At issue in this case is whether an employee must expressly request leave under the MPLA to invoke the protections of the Act. Hansen argues that the district court erred as a matter of law because the MPLA only requires an employee to inform her employer of the conditions that may necessitate a leave under the MPLA and that Hansen did so in this case. Hansen also argues that RHI agreed to extend her MPLA leave, and that by doing so, RHI also extended her right of reinstatement.[3]

For the reasons discussed below, we conclude that an employee is required only to state a qualifying reason for needing leave under the MPLA in order to invoke the protections of the Act and that Hansen did so in this case. We also conclude that there is at least a material dispute of fact as to whether Hansen's leave was extended. But even if her leave was extended, Hansen is not entitled to reinstatement, as a matter of law, because her right to reinstatement was not extended.

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. "On appeal from summary judgment, we ask two questions: (1) whether there are any genuine issues of material fact and (2) whether the lower courts erred in their application of the

---

**3.** Hansen also argues that section 181.942, subdivision 1(b), does not apply because (1) Hansen did not lose her position *during* her leave and (2) the district court determined that Hansen lost her job as a result of a reduction in force, not a layoff. Because we conclude that Hansen's right to reinstatement was never extended, we do not reach the issue of whether section 181.942, subdivision 1(b), applies here.

law." *State v. French,* 460 N.W.2d 2, 4 (Minn.1990).

We review the district court's construction of a statute de novo. *Eischen Cabinet Co. v. Hildebrandt,* 683 N.W.2d 813, 815 (Minn.2004); *Am. Family Ins. Grp. v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000). The first step when interpreting a statute is to determine whether the language of the statute is ambiguous. *See Gassler v. State,* 787 N.W.2d 575, 584 (Minn.2010). A statute is ambiguous when the language is subject to more than one reasonable interpretation. *Hans Hagen Homes, Inc. v. City of Minnetrista,* 728 N.W.2d 536, 539 (Minn.2007). When the Legislature's intent is not clearly discernible from the explicit words of the statute, we advance to other steps to ascertain the intent of the Legislature. *See* Minn.Stat. § 645.16 (2010).

### A.

The district court held that Hansen was required to specifically invoke the MPLA when requesting leave. Hansen argues that the court erred as a matter of law in dismissing her reinstatement claim under the MPLA because (1) the MPLA is silent as to how leave should be requested and (2) the court should have followed the parallel federal cases interpreting the Family and Medical Leave Act ("FMLA"), which only require an employee to inform her employer of the conditions that may necessitate a leave under the FMLA. Hansen has the better argument here.

Under the MPLA, "[a]n employer must grant an unpaid leave of absence to an employee who is a natural ... parent in conjunction with the birth ... of a child. The length of the leave shall be determined by the employee, but may not exceed six weeks, unless agreed to by the employer." Minn.Stat. § 181.941, subd. 1. The MPLA defines an employee as "a person who performs services for hire for an employer *from whom a leave is requested under sections 181.940 to 181.944.*" Minn.Stat. § 181.940, subd. 2 (emphasis added).

Contrary to the result reached by the district court and the position advanced by RHI here, the plain language of the MPLA does not require an employee to specifically refer to the Act when requesting a leave. The language relied on by the court—"from whom leave is requested under sections 181.940 to 181.944"—does not specify the terms by which such leave must be requested. When interpreting statutes, "words and phrases are construed according to rules of grammar and according to their common and approved usage." Minn.Stat. § 645.08(1). *Merriam–Webster's Collegiate Dictionary* 1363 (11th ed.2004) defines the word "under" as "subject to the authority, control, guidance, or instruction of." According to this definition, an employee must request leave that is "subject to the authority" of the MPLA, *i.e.,* she must request leave for one of the reasons specified in sections 181.941 to 181.9413 (birth or adoption of a child, school conference and activities, or illness or injury of child) but is not required to specifically reference the MPLA in doing so. The common and approved usage of the word "under" has never been "to expressly invoke."

In arguing for a plain meaning definition that requires express invocation of the MPLA, RHI attempts to contrast the FMLA with the MPLA. RHI argues that "the FMLA does not contain any provision requiring, or even suggesting, that an employee must specifically request leave under the FMLA." But similar to the MPLA, the FMLA defines "eligible employee" as one "who has been employed ... for at least 12 months by the employer with re-

spect to *whom leave is requested under section 2612 of this title.*" 29 U.S.C. § 2611(2)(A)(i) (2006) (emphasis added). Given this similarity, it is significant that the Department of Labor has promulgated rules providing that express invocation of the FMLA is unnecessary: "An employee giving notice of the need for FMLA leave does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice, though the employee would need to state a qualifying reason for the needed leave...." 29 C.F.R. § 825.301(b) (2011). Case law has been consistent with this regulation. *See, e.g., Kobus v. Coll. of St. Scholastica, Inc.,* 608 F.3d 1034, 1036–37 (8th Cir.2010); *Rask v. Fresenius Med. Care N. Am.,* 509 F.3d 466, 474 (8th Cir. 2007).

■ Assuming the statute is ambiguous due to silence as to the mechanism by which an employee is entitled to the protections of the statute, we determine the intent of the Legislature by other means. "When the words of a law are not explicit, the intention of the legislature may be ascertained by considering, among other matters: (1) the occasion and necessity for the law; (2) the circumstances under which it was enacted; (3) the mischief to be remedied; [and] (4) the object to be attained...." Minn.Stat. § 645.16 (2010). The MPLA is a remedial law.[4] Generally, "statutes which are remedial in nature are entitled to a liberal construction, in favor of the remedy provided by law, or in favor of those entitled to the benefits of the statute." *Blankholm v. Fearing,* 222 Minn. 51, 54, 22 N.W.2d 853, 855 (1946) (citation omitted). In construing the MPLA liberally, an employee should be entitled to the protections of the Act when she informs her employer of a qualifying reason for the needed leave and is otherwise eligible for such leave. A narrow reading of the MPLA would deny an employee the protections of the statute based on the technicality of failing to expressly invoke the statute.

■ The record shows Hansen informed RHI of a qualifying reason for her leave. When Hansen completed her leave of absence request form, she completed section A of the form pertaining to "short-term medical disability," "pregnancy-related disability," or "worker's compensation disability" leave. She completed the line entitled "[p]regnancy-related disability" and stated her delivery date. In addition, Hennen admitted that she was on notice that Hansen would need to leave due to Hansen's complications related to her pregnancy. Because Hansen stated a qualifying reason for needing leave under the MPLA—childbirth—we conclude that she invoked the protections of the Act.

## B.

■ Hansen next argues that RHI agreed to extend her MPLA leave, and that by doing so, RHI also extended her right to reinstatement. We conclude that an extension of MPLA leave does not extend the right to reinstatement. Thus, even though Hansen's leave may have been extended, she was not entitled to reinstatement, as a matter of law, because her right to reinstatement was never extended.

Minnesota Statutes § 181.941, subd. 1 provides: "The length of the leave shall be determined by the employee, but may not

---

4. Minn.Stat. § 181.944 provides:
 [A] person injured by a violation of sections 181.940 to 181.943 may bring a civil action to recover any and all damages recoverable at law, together with costs and disbursements, including reasonable attorney's fees, and may receive injunctive and other equitable relief as determined by a court.

exceed six weeks, *unless agreed to by the employer.*" (Emphasis added.) Hansen argues that RHI agreed to extend her MPLA leave to December 1, 2008. The evidence she cites in support of her argument is a leave of absence personnel action form ("PAF") filled out by Amber Hennen on October 29, 2008. Under leave type, Hennen checked the box for "Maternity," leaving blank the box for "FMLA" and "personal" leave. Under the caption of "Action Codes," Hennen selected the box "Extend Existing Leave" as opposed to the box "Change Leave Type." In the "Anticipated Return Date" box, Hennen wrote in December 1, 2008. Based on this evidence, we conclude that there is at least a material dispute of fact whether RHI agreed to extend Hansen's leave under the MPLA.

■ But we agree with the district court that, even if Hansen's MPLA leave was extended, her right to reinstatement was not extended. Even assuming that RHI agreed to extend Hansen's leave under the MPLA, there is no language in the MPLA to suggest that an extension of leave also extends the right to reinstatement. Because the FMLA provides that upon return from a leave covered by the Act, an employee is entitled to be restored to the same or equivalent position by the employer, we find the jurisprudence interpreting the FMLA instructive. *See* 29 U.S.C. § 2614(a) (2006). Federal courts interpreting the FMLA have held that an expiration of leave terminates the right to reinstatement to the same or equivalent position. *See Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 763–64 (5th Cir. 2001); *Mondaine v. Am. Drug Stores, Inc.*, 408 F.Supp.2d 1169, 1205–06 (D.Kan. 2006). The absence of statutory language extending the right to reinstatement and the case law interpreting the FMLA support our conclusion that, absent a specific

agreement to reinstate, an extension of leave under the MPLA does not extend the right to reinstatement. RHI's September 11, 2008 letter to Hansen shows that RHI never agreed to extend Hansen's right to reinstatement: "At the conclusion of your Short Term Disability/FMLA Leave, a Personal Leave may be granted at the discretion of your manager for up to four weeks. An employee on personal leave *has no guarantee of job reinstatement to any position at the conclusion of a personal leave.*" (Emphasis added.) RHI clearly and unequivocally, in the September 11, 2008 letter, advised Hansen that she would forfeit her right to reinstatement if she extended her leave past 12 weeks. Because we conclude that Hansen's right to reinstatement was never extended, we hold that the district court did not err in granting summary judgment to RHI on Hansen's reinstatement claim.

## II.

■ We next turn to Hansen's argument that the district court erred in granting summary judgment in favor of RHI on her retaliation claim under the MPLA. Specifically, she argues that (1) she properly pleaded a retaliation claim under the MPLA in her amended complaint and (2) RHI's reason for eliminating her position was a pretext for retaliation. Because we conclude that Hansen failed to plead a retaliation claim under the MPLA, we do not reach the issue of whether RHI's reason for eliminating her position was a pretext for retaliation.

■ The applicable provision of the MPLA provides: "An employer shall not retaliate against an employee for requesting or obtaining a leave of absence as provided by this section." Minn.Stat. § 181.941, subd. 3. Minnesota is a notice-pleading state that does not require absolute specificity in pleading, but rather re-

quires only information sufficient to fairly notify the opposing party of the claim against it. *See* Minn. R. Civ. P. 8.01 (requiring pleading to include "a short and plain statement of the claim showing that the pleader is entitled to relief"); *see also Roberge v. Cambridge Coop. Creamery Co.,* 243 Minn. 230, 232, 67 N.W.2d 400, 402 (1954) (stating that pleadings must "be framed so as to give fair notice of the claim asserted and permit the application of the doctrine of *res judicata* ").

In her amended complaint, Hansen alleges:

34. The Minnesota Parenting Leave Act, Minn.Stat. § 181.941, mandates that an employee be granted a leave of absence in connection with the birth of a child.

. . .

36. Upon her return from leave, Plaintiff was not returned to her former position or a comparable position. Instead, she was returned to work for one day, allowed to perform no duties during that day, and then terminated the following day under the pretext that her position had been eliminated.

37. Defendant's actions above violate[ ] the Minnesota Parenting Leave Act.

Hansen's amended complaint, at most, asserts that she was fired on a pretextual basis; it says nothing whatsoever about retaliation for requesting a leave and thus fails to put RHI on notice of a retaliation claim. Because Hansen failed to plead a retaliation claim under the MPLA in her amended complaint, we hold that the district court did not err in granting summary judgment to RHI on the retaliation claim.

### III.

Regarding her sex discrimination claim under the MHRA, Hansen argues that she established a prima facie case. Specifical-

ly, she argues that RHI did not engage in a bona fide reduction in force and that, even if it did, she met her burden of showing that her pregnancy was a factor in RHI's termination decision. We conclude that there is no material dispute of fact that RHI engaged in a bona fide reduction in force and that Hansen failed to show that her pregnancy was a factor in RHI's termination decision.

 Claims under the MHRA, not involving direct evidence of discriminatory animus, are subject to the three-part burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Hoover v. Norwest Private Mortg. Banking,* 632 N.W.2d 534, 542 (Minn.2001). Under this framework, a plaintiff must first make out a prima facie case of discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817. Once established, the burden then shifts to the employer to articulate a legitimate and nondiscriminatory reason for the adverse employment action. *Goins v. W. Grp.,* 635 N.W.2d 717, 724 (Minn.2001). The burden then shifts again to the plaintiff to put forward sufficient evidence to demonstrate that the employer's proffered explanation was pretextual. *Id.*

██ To establish a prima facie case of discriminatory discharge, an employee must show that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she was discharged; and (4) the employer assigned a nonmember of the protected class to do the same work. *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 442 (Minn.1983). When an employee is discharged pursuant to a bona fide reduction in force, however, " 'some additional showing [is] necessary to make a prima facie case.' " *Dietrich v. Canadian*

*Pac. Ltd.*, 536 N.W.2d 319, 324 (Minn.1995) (quoting *Holley v. Sanyo Mfg., Inc.*, 771 F.2d 1161, 1165 (8th Cir.1985)). Specifically, an employee must make an additional showing that her sex was a factor in the termination decision. *Cf. Dietrich*, 536 N.W.2d at 324–25 (requiring an additional showing that age was a factor in the termination decision). RHI makes no contention that Hansen failed to establish the first four elements of the prima facie case but argues that, because she was discharged pursuant to a reduction in force, she must make an additional showing that sex was a factor in the termination decision. Hansen argues that there is at least a question of fact as to whether a reduction in force occurred and that therefore summary judgment was inappropriate.

The district court did not err in determining that, as a matter of law, a bona fide reduction in force occurred. In *Dietrich*, we adopted the standard articulated by the Sixth Circuit:

[a] work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is re-

placed only when another person is hired or reassigned to perform the plaintiff's duties.

*Id.* at 324 (alteration in original) (quoting *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990)). There is no material question of fact that RHI eliminated one or more positions within the company; the severe revenue reductions resulted in significant employee layoffs. At the beginning of 2008, RHI's perm team in the Central Zone had 20 employees, but by the end of the first quarter of 2009, the team had been reduced to a total of 8. The perm teams in Columbus, Ohio, and Saint Louis, Missouri, were completely eliminated. The perm team in the Minneapolis office was reduced from four employees to one employee.

Hansen disputes the occurrence of a reduction in force because "all employees on the permanent team, except [her], were 'afforded the opportunity' to transfer to the temporary team instead of being eliminated." But Hansen does not dispute that the perm team positions were eliminated, and she does not allege that any of the transferred employees continued to perform perm team duties. She does not allege, for example, that employees transferred to the temp team continued to place permanent candidates. Furthermore, there is no evidence suggesting that Hansen or anyone else on the perm team was "replaced" after termination, *i.e.*, no one was hired to handle perm team duties after the positions were eliminated.[5]

---

**5.** Hansen contends that there is a question of material fact whether anyone was hired to handle perm team duties after the positions were eliminated because Jennifer Hedin, John Nilsen, and Lisa Breiland were hired while Hansen was on leave. Marilyn Bird sent Hedin a letter dated September 30, 2008, offering her a position as a recruiting manager. This offer of employment was sent before the fourth quarter of 2008, when Bird was direct-

ed by Clark to start reducing the number of employees. John Nilsen began his employment as a recruiting manager on August 27, 2008, but was terminated a few weeks later. Neither Hedin nor Nilsen could be said to have "replaced" Hansen, because Hansen's employment was not terminated until December 2, 2008. Lisa Breiland was hired as an account executive for the temp team and her hiring is irrelevant to determining whether

When an employee's position is eliminated as part of a reduction in force, the employee has the burden of showing that her sex was a factor in the decision to eliminate her position. *See Dietrich*, 536 N.W.2d at 324–25. To make this showing, Hansen needs to offer evidence from which a fact finder might reasonably conclude that the employer intentionally discriminated. *See Holley*, 771 F.2d at 1166. To make this further showing, an employee

> must present additional evidence of a discriminatory motive, whether in the form of discriminatory comments by the decisionmaker, statistical evidence that the employer consistently lays off members of the plaintiff's [protected category], or some such evidence.

*Munshi v. Alliant Techsystems, Inc.*, No. CIV. 99–516PAMJGL, 2001 WL 1636494, at *4 (D.Minn. June 26, 2001); *see Holley*, 771 F.2d at 1166.

Hansen does not offer evidence that RHI systematically discriminated against women who took pregnancy-related leave. Hansen contends that RHI discriminated against her because she was the only employee on the perm team not given the opportunity to transfer. She also argues that RHI's contention that she was a poor performer was pretextual. But Hansen offers no evidence that other women who took pregnancy leaves were discriminated against or that women without children were preferred. Instead she focuses on one isolated case, her own, and contends that the "only factor setting [her] apart from all of the other employees" was the fact that she "just had a baby and had just returned from pregnancy leave." To the best of Bird's knowledge, "none of the other 11 [RHL] permanent placement employees selected for termination in the Central Zone were pregnant." Hansen fails to make the "additional showing" that the perm team positions were eliminated as

her sex was a factor in RHI's decision to terminate her employment.

Hansen argues that comments made by Hennen establish a discriminatory animus. Hansen testified that Hennen—upon learning that a female employee was on fertility drugs—stated "if she was going to become pregnant she had to get rid of her or she was going to be stuck with her because she was pregnant." Hansen also recalls Hennen stating, after interviewing a potential female employee, "too bad we can't hire her, because she is great, because she is pregnant." Hansen also recalls Hennen telling Sarah Dunn not to talk about her pregnancy.

Under the *McDonnell Douglas* framework, "stray remarks, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process are insufficient to establish a prima facie case." *Smith v. DataCard Corp.*, 9 F.Supp.2d 1067, 1079 (D.Minn.1998). Hennen's comments fail to establish a discriminatory animus because Hennen played no part in the decision to terminate Hansen; instead it was Bird who decided to eliminate Hansen's position. Because there is no genuine dispute of material fact that RHI engaged in a bona fide reduction in force and Hansen failed to show that her sex was a factor in RHI's termination decision, we conclude that the district court did not err in granting summary judgment to RHI on Hansen's sex discrimination claim under the MHRA.

Affirmed.

DIETZEN, Justice, took no part in the consideration or discussion of this case.