*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0681**

Scott R. McKee, M. D.,
Appellant,

vs.

St. Paul Eye Clinic, P. A., et al.,
Respondents.

**Filed April 20, 2015
Affirmed
Kirk, Judge**

Ramsey County District Court
File No. 62-CV-12-8028

Sam Hanson, John M. Degnan, Neal T. Buethe, Scott M. Flaherty, Briggs and Morgan, P.A., Minneapolis, Minnesota (for appellant)

William M. Hart, Bradley J. Lindeman, Laura C. Sands, Julia J. Nierengarten, Meagher & Geer, P.L.L.P., Minneapolis, Minnesota (for respondents)

Considered and decided by Ross, Presiding Judge; Kirk, Judge; and Reilly, Judge.

**U N P U B L I S H E D   O P I N I O N**

**KIRK**, Judge

Appellant-physician, a former shareholder and employee of three closely held corporations, appeals the district court's grant of summary judgment, arguing that there are genuine issues of material fact concerning whether respondent-shareholders

(1) violated common-law fiduciary duties owed to him as a shareholder-employee, (2) violated the peer-review statute, and (3) proffered a reason for terminating his employment that was a pretext for age discrimination. We affirm.

## FACTS

Appellant Scott R. McKee, M.D., an ophthalmologist and surgeon, was a 30-year employee of respondents St. Paul Eye Clinic, P.A. and Eye Surgery Associates, Inc. St. Paul Eye Clinic and Eye Surgery Associates are closely held corporations that employ physicians for its clinics and Midwest Surgery Center (MSC), its outpatient surgical facility. Dr. McKee was a shareholder of St. Paul Eye Clinic and Eye Surgery Associates, which were organized under the Minnesota Business Corporation Act (MBCA) Minn. Stat. §§ 302A.001-.92 (2014).[1] Respondents in this action also include 12 physicians who are shareholders of St. Paul Eye Clinic and Eye Surgery Associates and one hospital administrator who is a shareholder of Eye Surgery Associates.

In 2008, Dr. McKee signed an at-will employment agreement with St. Paul Eye Clinic that included a provision stating that his employment could be terminated with or without cause. Dr. McKee also signed a stock-sale-and-redemption agreement acknowledging that he did not have any reasonable expectation under Minn. Stat. § 302A.751 of the MBCA that the ownership of the shares entitled him to rights as an employee or officer of the company that would not exist if he was not a shareholder.

---

[1] Dr. McKee was also a member of respondent Northway Resource Development, LLC, which is a limited-liability company owned by the shareholders of St. Paul Eye Clinic.

2

This case arose from two instances of alleged patient abuse by Dr. McKee during routine cataract surgery. On August 16, 2010, Dr. McKee was performing a cataract surgery at MSC on a male patient with Parkinson's disease. Three nurses who assisted during the surgery testified that they witnessed Dr. McKee physically assault the patient. One of the nurses, who had 21 years of experience and participated in more than 20,000 eye surgeries, testified that when the patient failed to follow Dr. McKee's verbal commands during surgery, Dr. McKee delivered several closed-fisted blows to the patient's head. The nurses' supervisor testified that she observed two of the nurses obviously distressed and in tears immediately after the surgery.

In his deposition, Dr. McKee denied assaulting the patient and testified that the patient experienced two rare and simultaneous complications during surgery: an oculogyric crisis where the eye suddenly jerked to the right and remained fixed in that position, and an expulsive hemorrhage, which can cause permanent blindness if not immediately treated. Dr. McKee claimed that to save the patient's eye, he performed a series of medical techniques, which included tapping the side of the patient's head with his fingers. Dr. McKee admitted during his deposition that while he was tapping the patient's head, "from one direction, [my hand] look[ed] like a fist." Dr. McKee requested the assistance of another physician during surgery, and the patient ultimately experienced no complications. Dr. McKee's surgical notes do not mention either complication or that he tapped the patient's head with his fingers during the surgery.

After the surgery, two of the assisting nurses drafted an incident report outlining their observations of patient abuse and delivered it to their supervisor within the week.

3

The contents of the incident report were shared with members of MSC's administrative committee, and it was referred to MSC's executive committee. MSC's executive committee convened the peer-review committee, which conducted a peer-level review of the August 2010 incident. At the conclusion of the review, the peer-review committee requested that Dr. McKee attend anger-management counseling. The peer-review committee approved Dr. McKee's request to attend private counseling sessions, but he never attended a session.

On February 28, 2011, Dr. McKee performed a routine cataract extraction on an elderly patient at the HealthEast surgery center. An interpreter was present in the operating room because the patient did not speak English. Two nurses who assisted Dr. McKee during the surgery testified that Dr. McKee hit the patient in order to gain her compliance. One nurse testified that she found the incident to be very unusual and inappropriate because "[t]o swat anybody, especially in healthcare, it's just not appropriate." The surgery was ultimately successful.

One of the nurses reported the incident of patient abuse to her supervisor, who in turn relayed the information to several physicians at the St. Paul Eye Clinic. In response to the second account of patient abuse committed by Dr. McKee, the physicians convened a special meeting of the board of directors to discuss the issue. Thomas Rice, M.D., Chief Executive Officer, President, and Treasurer of St. Paul Eye Clinic and Eye Surgery Associates, sent a confidential third-party-report form to the Minnesota Health Professional Services Program (HPSP) asking them to investigate Dr. McKee for any signs of a physical, mental-health, or chemical-dependency issue that would explain his

4

behavior. HPSP is a statutorily authorized agency that assists healthcare professionals to address illness, chemical-dependency, or mental-health issues while retaining their licenses.

At the March 15 board of directors meeting, all of the majority shareholders were in attendance. Addressing his colleagues, Dr. McKee denied hitting the patient in February and explained the medical techniques he used to address the complications that arose during the August 2010 surgery. The board voted to place Dr. McKee on an indefinite leave of absence pending the outcome of the HPSP report. Dr. McKee agreed with the board's decision. Two weeks later, a report detailing the findings of the HPSP assessments was issued. At the direction of HPSP, Dr. McKee had undergone a psychiatric assessment, a general medical evaluation, and neuropsychological and neurocognitive assessments, and the examining physicians found no evidence of any untreated disease.

At the annual two-day retreat in April 2011, the St. Paul Eye Clinic held another board meeting, which was attended by all of the physicians. Dr. McKee again addressed the physicians and demanded that he be allowed to return to active employment. Dr. Rice testified that Dr. McKee was "very agitated and very aggressive towards other board members. He pounded the table several times demanding to be reinstated." The board made no decision on Dr. McKee's employment at that meeting.

Several days later, the board voted unanimously to terminate Dr. McKee's employment based on the incidents involving his treatment of patients and his response to the board's concerns about his actions. As a result, Dr. McKee brought an action against

respondents alleging breach of fiduciary duty and age discrimination. Respondents moved for summary judgment. The district court held a lengthy hearing on respondents' motion during which it repeatedly asked Dr. McKee's counsel, in light of the extensive discovery in the case, to state a material fact demonstrating a causal connection between an alleged breach of fiduciary duty by respondents and Dr. McKee's claimed damages. In a thorough and well-reasoned order, the district court granted respondents' motion for summary judgment on all claims.

This appeal follows.

## D E C I S I O N

"On appeal from summary judgment, we must review the record to determine whether there is any genuine issue of material fact and whether the district court erred in its application of the law." *Dahlin v. Kroening*, 796 N.W.2d 503, 504 (Minn. 2011); *see* Minn. R. Civ. P. 56.03. "On appeal, the reviewing court must view the evidence in the light most favorable to the party against whom judgment was granted." *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn. 1993). No genuine issue for trial exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 69 (Minn. 1997) (alteration in original) (quoting *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)) (quotation marks omitted).

**I.    There are no genuine issues of material fact regarding whether the majority shareholders breached a fiduciary duty to Dr. McKee.**

Dr. McKee argues that there are genuine issues of material fact regarding whether the majority shareholders breached a fiduciary duty owed to him as a minority shareholder.  In support of his argument, Dr. McKee cites the requirement of shareholders not to act in an unfairly prejudicial manner toward other shareholders, as outlined in Minn. Stat. § 302A.751, subd. 1(b)(3), and the common-law fiduciary duty of shareholders to disclose material facts to one another.  *See Berreman v. West Publ'g Co.*, 615 N.W.2d 362, 370-71 (Minn. App. 2000), *review denied* (Minn. Sept. 26, 2000).  "[A]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."  *Id.* at 371 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S. Ct. 978, 983 (1988)) (quotation marks omitted).  Materiality depends on the specific facts of each case.  *Id.*

Specifically, Dr. McKee argues that St. Paul Eye Clinic breached its fiduciary duty to him when it: (1) failed to give him proper notice that it was planning to discuss the February 2011 incident at the March 15 board meeting; (2) failed to complete a reasonable and thorough investigation into the incidents before terminating his employment; (3) submitted an inaccurate third-party report to HPSP; and (4) failed to consider the findings of the HPSP report clearing him of any medical or psychological issues.

The MBCA recognizes the duty of shareholders in closely held corporations to act in an honest, fair, and reasonable manner.  Minn. Stat. § 302A.751, subd. 3a.  "Breaches

of fiduciary duty are probably unfairly prejudicial within the meaning of section 302A.751, subd. 1(b)(3)." *Berreman*, 615 N.W.2d at 373. There is also a common-law fiduciary duty, which is separate and distinct from the remedies provided by the MBCA. *Id.* at 369. The common-law fiduciary duty requires shareholders in a close corporation to deal "openly, honestly and fairly with other shareholders." *Pedro v. Pedro*, 489 N.W.2d 798, 801 (Minn. App. 1992) (quotation omitted), *review denied* (Minn. Oct. 20, 1992).

This case asks us to decide whether the majority shareholders breached a fiduciary duty to a minority shareholder by terminating that shareholder's employment, which resulted in a forced buy-out of his shares. The business-judgment rule creates a "presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation." *In re Xcel Energy, Inc.*, 222 F.R.D. 603, 606 n.3 (D. Minn. 2004) (quotation omitted); *see Potter v. Pohlad*, 560 N.W.2d 389, 392 (Minn. App. 1997), *review denied* (Minn. June 11, 1997).

Summary judgment is only appropriate if no rational factfinder could find that the majority shareholders breached their fiduciary duty towards Dr. McKee by terminating his employment. *See Gunderson v. Alliance of Computer Prof'ls, Inc.*, 628 N.W.2d 173, 189 (Minn. App. 2001), *review granted* (Minn. July 24, 2001) *and appeal dismissed* (Minn. Aug. 17, 2001). A shareholder-employee's expectation of continued employment is reasonable if it "can fairly be characterized as part of the shareholder's investment." *Id.* at 191 (quotation omitted). But any expectation of continued employment must be

8

balanced against the reasonableness of the employee-shareholder's expectations and "the controlling shareholder's need for flexibility to run the business in a productive manner." *Id.* at 186, 191.

Viewing the evidence in the light most favorable to Dr. McKee, no rational factfinder could conclude that he possessed a reasonable expectation of continued employment based on the provisions of the employment and buy-sell agreement. Minnesota law presumes that the terms of any written agreement reflect the reasonable expectations of the parties. Minn. Stat. § 302A.751, subd. 3a; *see also Gunderson*, 628 N.W.2d at 186 (stating that a shareholder's expectations "are presumptively reflected in the buy-sell agreement as to matters covered by the agreement"). As an at-will employee, Dr. McKee knew that his employment could be terminated at any time. Moreover, the buy-sell agreement affirmed Dr. McKee's reasonable expectation that under section 302A.751 he had no additional rights as an employee by virtue of his status as a shareholder.

The majority shareholders made a rational business judgment to terminate Dr. McKee's employment based on their honest belief that he had an anger-management problem and that his continued employment posed a significant liability to the clinic. "[N]o breach of fiduciary duty occurs if the controlling group can demonstrate a legitimate business purpose for its action." *Gunderson*, 628 N.W.2d at 191 (quoting *Wilkes v. Springside Nursing Home, Inc.*, 353 N.E.2d 657, 663 (Mass. 1976)) (quotation marks omitted). The majority shareholders presented strong, compelling evidence from several reliable eyewitnesses that on two separate occasions in two different hospital

9

settings, Dr. McKee committed patient abuse by hitting a patient that he considered to be noncompliant during routine cataract surgery. When Dr. McKee was first confronted with the evidence of the August 2010 incident, he refused to acknowledge what had occurred and his behavioral problems persisted.

At oral argument, Dr. McKee asked this court to conclude that the majority shareholders' exercise of the business-judgment rule is eclipsed by their fiduciary duty to follow "the highest standard of duty implied by law," which requires them to conduct a meticulous, thorough investigation into the allegations before terminating his employment. *See D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. App. 1997). In support of his position, Dr. McKee draws from the holding of *Appletree Square I, Ltd. v. Investmark, Inc.*, 494 N.W.2d 889, 893 (Minn. App. 1993), *review denied* (Minn. Mar. 16, 1993), arguing that majority shareholders cannot use contracts or make business judgments that destroy the fiduciary character of the shareholder relationship.

Contrary to Dr. McKee's position at oral argument, the business-judgment rule *does* apply in situations exactly like this. *See Wilkes*, 353 N.E.2d at 663.[2] Courts do not "sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve

---

[2] The *Wilkes* court concluded that there was no legitimate business purpose for the majority shareholders' removal of a minority shareholder from the payroll and refusal to reelect him as a salaried officer and director. 353 N.E.3d at 663. Because "[t]here was no showing of misconduct on the [minority shareholder's] part as a director, officer or employee of the corporation which would lead us to approve the majority action as a legitimate response to the disruptive nature of an undesirable individual bent on injuring or destroying the corporation." *Id.* at 664. In contrast, respondents were faced with evidence of several instances where Dr. McKee's angry outbursts with patients and colleagues threatened the viability of the business.

intentional discrimination." *Vaughn v. Roadway Express, Inc.*, 164 F.3d 1087, 1091 (8th Cir. 1998) (quotation omitted). "It is not [the court's] province to determine whether the employer's investigation of alleged employee misconduct reached the correct result, so long as it truly was the reason for the plaintiff's termination." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1004 (8th Cir. 2012). Employers can make even hasty business decisions so long as they do not discriminate unlawfully, and there is no evidence that St. Paul Eye Clinic purposely ignored material information or truncated the investigation in order to terminate Dr. McKee's employment due to his advanced age.[3] *See id*. at 1005.

Here, Dr. McKee alleges that Dr. Rice initially submitted an inaccurate third-party report to HPSP, which included erroneous information portraying him as reckless and incompetent. The alleged errors included a misreporting of the date of the February 2011 incident by a few weeks, a reference to a conversation between the HealthEast supervisor and Dr. McKee where she informed him that his conduct was inappropriate, that Dr. McKee's surgical caseload was relatively light on the day of the February 2011 incident, and that St. Paul Eye Clinic had concerns that Dr. McKee was "exhibiting a pattern of behavior where he is using inappropriate and excessive force to obtain patient cooperation." But even if these errors occurred, they do not create genuine issues of

---

[3] Dr. McKee argues that he was not treated fairly regarding the majority shareholders' investigation of the February 2011 incident, citing the HealthEast supervisor's testimony that the nurse anesthetist assisting Dr. McKee during the surgery told her that he did not hit the patient. However, both nurses who were present during the surgery testified under oath at their depositions that the patient abuse did in fact occur, and Dr. McKee chose not to depose the nurse anesthetist.

11

*material* fact because there is no evidence in the record that they ultimately affected the findings of the HPSP report or led to the termination of his employment.

Moreover, the HealthEast supervisor and Dr. Rice did not intentionally withhold information from Dr. McKee concerning the February 2011 incident, as Dr. McKee claims. Dr. Rice informed Dr. McKee prior to the March 15 meeting that Dr. Rice had received a report from HealthEast that Dr. McKee had slapped a patient, and Dr. Rice and the HealthEast supervisor possessed the same information about the incident as Dr. McKee did. The HPSP report was also not "fraudulently concealed" from the majority shareholders, as Dr. McKee alleges. Dr. Rice read the report aloud to the shareholders at the April retreat, and a copy of the report was also distributed among the majority shareholders.

The fact that the HPSP report found no evidence of any medical or neurological impairment was not purposely disregarded by the majority shareholders, as they acknowledged and discussed the findings at the retreat. They remained greatly concerned, however, about allowing Dr. McKee to return to his surgical practice in light of the fact that there was no identifiable medical cause or organic psychological reason for his previous display of excessive aggressiveness in the operating room. Dr. McKee was also not medically cleared to return to his employment duties by the findings of the HPSP report, as he claims. From an employment perspective, the HPSP report was purely advisory in nature and a case manager at HPSP informed the majority shareholders in a separate letter to consider "non-illness related issues" impacting Dr. McKee's medical practice.

12

It was also not possible for the majority shareholders to follow an alternative course of action that was less harmful to Dr. McKee's minority shareholder interest, such as allowing him to remain on staff as a senior physician. *See Wilkes*, 353 N.E.2d at 663 (stating that "[i]f called on to settle a dispute, our courts must weigh the legitimate business purpose, if any, against the practicability of a less harmful alternative"). The record is replete with testimony from several majority shareholders regarding Dr. McKee's angry outbursts directed at his work colleagues. One majority shareholder testified that he had had numerous uncomfortable conversations with Dr. McKee. In one instance, Dr. McKee had told him that that he wanted to "settl[e] things with a duel." In another instance, when a physician who was a longtime friend of Dr. McKee attempted to talk to him about the August 2010 incident over a beer at a restaurant, Dr. McKee became so angry and upset that the physician feared for his life because Dr. McKee blamed him and other physicians for his professional problems. Fearful of a potential confrontation with Dr. McKee, some St. Paul Eye Clinic physicians acquired conceal-and-carry permits for a firearm. Many of the physicians felt that they could no longer work with Dr. McKee because of his difficult behavior. In light of this evidence, the majority shareholders acted within the scope of the business-judgment rule when they terminated Dr. McKee's employment.

## II. The majority shareholders did not breach a fiduciary duty under the peer-review statute.

"When the district court grants a summary judgment based on its application of statutory language to the undisputed facts of a case, . . . its conclusion is one of law and

13

our review is *de novo*." *Lefto v. Hoggsbreath Enters., Inc.*, 581 N.W.2d 855, 856 (Minn. 1998).

Dr. McKee argues that the majority shareholders breached the confidentiality provision of the peer-review statute by disclosing the contents of the August 2010 incident report to the majority shareholders. Minn. Stat. § 145.64, subd. 1(a) (2014), states that all data and information discussed by a review organization is confidential and not subject to either discovery or subpoena.

Viewing the evidence in the light most favorable to Dr. McKee, we conclude that the August 2010 incident report was an original source document that was exempt from the restrictions of the peer-review statute. *See* Minn. Stat. § 145.64, subd. 1(a) (stating that documents "otherwise available from original sources shall not be immune from discovery or use in any civil action merely because they were presented during proceedings of a review organization"). There is no evidence that the nurses who drafted the report did so at the direction of a review organization. Rather, as MSC employees, they were trained to report this type of incident and drafted it without any outside assistance or direction and well before a peer-review assessment was convened to investigate Dr. McKee's conduct. There is also no evidence that MSC's peer-review committee ever acquired the incident report.

Dr. McKee's argument that the majority shareholders breached their fiduciary duty to him by violating the peer-review statute is without merit. Dr. McKee failed to invoke the provider-data exception allowing him to obtain peer-review information relating to his medical staff privilege, membership, or participation status. Minn. Stat.

14

§ 145.64, subd. 2 (2014). As a result, there is no evidence in the record before us relating to what occurred in the peer-review process.

### III. The district court properly dismissed Dr. McKee's age-discrimination claim.

The Minnesota Human Rights Act prohibits an employer from discharging an employee based on age or disability. Minn. Stat. § 363A.08, subd. 2(2) (2014). A plaintiff may prove discriminatory intent either by direct evidence or by circumstantial evidence using the burden-shifting method adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973). *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 542 (Minn. 2001). Under this framework, the plaintiff must first make out a prima facie case of discrimination, and the employer then must articulate a legitimate, non-discriminatory reason for terminating the plaintiff's employment. *Hansen v. Robert Half Int'l, Inc.*, 813 N.W.2d 906, 918 (Minn. 2012). To avoid summary judgment on the third prong of the *McDonnell Douglas* test, the plaintiff "must put forth sufficient evidence for the trier of fact to infer that the employer's proffered legitimate nondiscriminatory reason is not only pretext but that it is pretext for discrimination." *Hoover*, 632 N.W.2d at 546.

Dr. McKee claims that St. Paul Eye Clinic's decision to terminate him was motivated by his age as he was the most senior ophthalmologist and surgeon on staff, and he points to the fact that the clinic hired an optometrist after his employment was terminated. The district court found that despite the fact that Dr. McKee satisfied the first two prongs of the *McDonnell Douglas* test, there was overwhelming evidence in the record that his employment was terminated for patient abuse and his failure to

15

acknowledge or address his anger-management issues. And that any argument that his age impacted the decision is purely speculative.

Here, Dr. McKee has not demonstrated that a genuine issue of material fact exists concerning pretext. As discussed in section I, the record is insufficient to permit a rational factfinder to believe that St. Paul Eye Clinic terminated Dr. McKee's employment for anything other than non-discriminatory reasons. The district court's grant of summary judgment is supported by the record.

**Affirmed.**