*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0477**

Charles Pearson,
Appellant,

vs.

Rohn Industries, Inc., et al.,
Respondents.

**Filed December 21, 2015
Affirmed
Cleary, Chief Judge**

Stearns County District Court
File No. 73-CV-12-7130

Nicholas G. B. May, Jenny M. Helling, Fabian May & Anderson, PLLP, Minneapolis, Minnesota (for appellant)

Susan D. Thurmer, Robyn K. Johnson, Cousineau McGuire Chartered, Minneapolis, Minnesota (for respondents)

Considered and decided by Cleary, Chief Judge; Connolly, Judge; and Johnson, Judge.

**U N P U B L I S H E D   O P I N I O N**

**CLEARY**, Chief Judge

Appellant Charles Pearson seeks review of the district court's denial of his motion for post-trial relief. Appellant asserts that the district court erred by (1) applying incorrect

legal standards to his claims of age discrimination and reprisal under the Minnesota Human Rights Act (MHRA); (2) denying his constitutional right to a jury trial; (3) denying his motion to compel discovery of recorded statements; and (4) considering evidence that was not properly admitted at trial. Appellant further argues that the cumulative effect of these errors requires a new trial. We affirm.

## FACTS

Pearson's claims of age discrimination and reprisal are associated with his period of employment at respondent Rohn Industries, Inc., a business that provides document and IT destruction and recycling services. Pearson was hired in March 2009 as a salesperson for Shred Right, Rohn's shredding-and-destruction-services division. He had previously worked in sales for over ten years at Shred-It, one of Rohn's competitors in the shredding-services industry.

The parties dispute some key facts surrounding Pearson's hiring at Rohn's Shred Right division. The district court found that after he left his job at Shred-It, Pearson contacted respondent James R. Beran, a sales manager for Rohn. The district court found that Pearson told Beran that "he was bored with his retirement and he wanted to sell shredding services again." Pearson met with Beran and respondent Ronald V. Mason Jr., the sole owner of Rohn, on multiple occasions to discuss the possibility of being hired at Rohn. The district court found that, during these discussions, Pearson stated that he would generate $1 million in annual sales for Shred Right. As a result of Pearson's representation, Mason offered Pearson a base salary guarantee of $96,000, which was substantially higher than salaries of other non-management-level sales staff at Shred Right. In a pre-trial

2

motion, Pearson denied saying that he would generate $1 million in sales if hired at Shred Right. Pearson also denies telling Beran and Mason that he had retired from Shred-It, when in fact he was fired from his job there. The district court credited the testimony of respondents Mason and Beran, who testified that Pearson said only that he had retired.

In 2009, Pearson fell substantially short of generating $1 million in sales. In the spring of 2010, Mason told Beran that Rohn would have to fire Pearson unless Pearson substantially increased his sales. Beran met with Pearson in April 2010 for Pearson's first annual review and stated that Pearson needed to improve his job performance. In September 2010, respondent Donald Drapeau became President of Shred Right. Mason tasked Drapeau with reforming the division's compensation structure in order to increase Rohn's profitability. To that end, Drapeau developed a Points System Plan that would reduce employees' base-salary guarantees. Management implemented the Points System Plan on January 1, 2011, resulting in a 30% reduction in Pearson's base salary. But by September 2011, Drapeau and Mason determined they were not satisfied with the plan. Beran and Drapeau began working on a new plan to be implemented in 2012. As of December 2011, Mason, Beran, and Drapeau had decided to decrease Pearson's salary to $50,000, effective March 1, 2012, in order to better align Pearson's salary with the sales revenue he was generating. The district court credited testimony that the standard base-salary guarantee in the shredding industry is 10% of sales revenue generated.

On January 5, 2012, Drapeau asked Pearson out to lunch with the intent to ask Pearson about his retirement plans, as Drapeau knew that Pearson's 65th birthday was approaching. At this time, Pearson did not know that respondents had decided to reduce

3

his salary to $50,000. Drapeau testified that he had known Pearson since 1999, from working with him before they were both at Rohn, and that by asking Pearson about his retirement plans, he was hoping to get information he could use to potentially "soften[ ] the blow" of the pay cut. Drapeau stated that he thought that management might be able to avoid cutting Pearson's salary if Pearson were intending to retire soon, or if he wanted to opt for a part-time position.

During their discussion at lunch, Pearson stated that he did not intend to quit working. Drapeau told Pearson that Mason believed Pearson's salary was too high. The district court found that Drapeau then asked Pearson whether Pearson could collect Social Security payments, and Pearson said he was not interested in taking the payments yet because he thought he would have to pay a penalty. The district court found that Drapeau then asked Pearson, "Well, you have enough money, don't you?"

On January 10, 2012, Beran notified Pearson that his base-salary guarantee would be reduced to $50,000, effective March 1, 2012. The district court found that Pearson was upset about the pay cut, that he exhibited hostility toward respondents in the workplace, that he told other employees that he would not accept the salary reduction, and that he was stunned and humiliated by the cut. The district court credited the testimony of respondents, several employees at Shred Right, and Pearson's wife on this point. During the week prior to February 6, 2012, Pearson went to Beran's office and confronted him about who would get commissions on a new account Pearson had been working on acquiring. In what became a heated exchange, Pearson brought up his salary reduction and Beran raised the issue of Pearson's claim that he would make $1 million in sales. After this interaction with

Pearson, Beran immediately went to Mason and the two agreed that Pearson should be fired. They decided to delay any action on it until Drapeau returned from vacation on February 6.

Pearson vigorously contests the facts the district court found regarding events of February 6, 2012. The parties agree that Pearson sent Mason an e-mail on the morning of February 6. The timestamp on the e-mail shows that Pearson sent it at 8:41 a.m. In the message, Pearson describes the conversation he had with Drapeau at lunch and states that he believes his salary has been unlawfully reduced on the basis of his age. Mason testified that he forwarded the e-mail to his attorney at 9:33 a.m. Mason and Beran met with Drapeau when he arrived at the office that morning and told him about the confrontation between Beran and Pearson that had occurred the week before. They told Drapeau that they had decided to fire Pearson. The district court credited respondents' testimony that they did not open Pearson's e-mail before the meeting and therefore did not consider it in their decision to fire Pearson.

On February 7, 2012, Beran and several Rohn staff members attended a meeting with Pearson to inform him that he was being fired. Beran provided Pearson with a termination letter stating that Pearson was being fired due to his failure to make the sales he had promised he would when he was hired, and because Pearson's salary was much higher than the salaries of comparable or higher-performing salespeople at the company. The letter also cited Pearson's negative reaction to the salary reduction as a reason he was being fired. Right after the meeting, Beran and the operations manager in attendance at the meeting both documented their recollection that when Pearson was told he was being fired,

5

he said he was surprised it hadn't happened "last week." The majority of Pearson's accounts were transferred to Beran, who was 48 years old at the time.

Pearson commenced this action against respondents, alleging age discrimination in violation of MHRA, Minn. Stat. § 363A.08, subd. 2 (2012) and Minn. Stat. § 181.81 (2012), and reprisal in violation of MHRA, Minn. Stat. § 363A.15 (2012).[1] Pearson moved for a trial by jury on all claims and raised a constitutional question regarding enforcement of the MHRA bench-trial requirement. The district court found for respondents after a bench trial, and Pearson moved for amended findings of fact, conclusions of law, and judgment, or in the alternative, a new trial. The district court considered Pearson's argument concerning the right to a jury trial and his motion for post-trial relief, and subsequently denied his motion to amend or for a new trial. This appeal followed.

## D E C I S I O N

**Age discrimination and reprisal claims**

Pearson argues that the district court's factual findings regarding his age discrimination and reprisal claims were clearly erroneous. Pearson also contends that the district court erred in applying the law to those facts.

No deference is given to a district court's determinations on questions of law. *Modrow v. JP Foodservice, Inc.*, 656 N.W.2d 389, 393 (Minn. 2003). But this court gives

---

[1] We cite the version of the MHRA that was in effect at the time Pearson commenced this action because Minn. Stat. § 363A.33, subd. 6 (2012) (regarding entitlement to a jury trial for MHRA claims) is relevant to this case and was amended since Pearson filed his action. 2014 Minn. Laws ch. 233, § 1, at 721.

6

great deference to a district court's findings of fact, and will not set them aside unless they are clearly erroneous. Minn. R. Civ. P. 52.01. "Findings of fact are clearly erroneous only if the reviewing court is left with the definite and firm conviction that a mistake has been made. If there is reasonable evidence to support the trial court's findings of fact, a reviewing court should not disturb those findings." *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn. 1999) (quotation and citations omitted). Appellate courts also defer to district court credibility determinations. *Sefkow v. Sefkow*, 427 N.W.2d 203, 210 (Minn. 1988).

Under the MHRA, an employer may not discharge an employee based on age. Minn. Stat. § 363A.08, subd. 2(2). A plaintiff may prove age discrimination under the direct-evidence framework, using either direct or circumstantial evidence. *Goins v. West Grp.*, 635 N.W.2d 717, 722-24 (Minn. 2001); *Friend v. Gopher Co.*, 771 N.W.2d 33, 40 (Minn. App. 2009), *review denied* (Minn. Nov. 23, 2010). A plaintiff may also prove discrimination under the three-part burden-shifting test established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). *Goins*, 635 N.W.2d at 724; *Friend*, 771 N.W.2d at 40. Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. *Goins*, 635 N.W.2d at 724. The burden then shifts to the employer to put forth a legitimate, non-discriminatory reason for firing the employee. *Id.* "If the employer articulates such a reason, the plaintiff must then put forward sufficient evidence to demonstrate that the employer's proffered explanation was a pretext for discrimination." *Id.* The plaintiff bears the burden of persuasion at all stages. *Id.* The *McDonnell-Douglas* test applies to age-discrimination claims under the MHRA and Minn. Stat. § 181.81, and

to reprisal claims under the MHRA. *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 548 (Minn. 2001); *Dietrich v. Canadian Pac. Ltd.*, 536 N.W.2d 319, 327 (Minn. 1995).

In this case, Pearson sought to prove his claim under the *McDonnell-Douglas* framework. The district court clearly applied the three-part test to Pearson's age-discrimination and reprisal claims and made its analysis explicit by linking numerous findings of fact to its conclusions of law. It found that Pearson had established a prima facie case of age discrimination based on Drapeau's questioning of Pearson about his retirement plans, and it found that respondents had "demonstrated a legitimate and non-discriminatory reason for the adverse employment action of reducing [Pearson's] salary." The district court found that Pearson had failed to prove any conduct by respondents—other than Drapeau's comments at lunch, which the district court found did not reflect discriminatory animus—that would show that respondents' stated reasons for the salary reduction were a pretext for age discrimination.

Regarding Pearson's reprisal claim, the district court found that Pearson had established a prima facie case of reprisal based on the short time that elapsed between his e-mail containing an allegation of discrimination and his subsequent discharge. Based on the trial evidence and testimony, the district court found that respondents established a legitimate, non-discriminatory reason for discharging Pearson. The court found that Pearson had not proved that respondents' reasons for firing him were merely a pretext for reprisal.

Pearson argues that the district court erred in its application of the law because it failed to determine whether Pearson's age or his complaint of age discrimination were motivating factors in respondents' decision to reduce his salary and fire him. Pearson also argues that the district court erred because it required Pearson to disprove each of the reasons respondents gave for why they reduced Pearson's pay and fired him.

An employer may have legitimate and illegitimate reasons for discharging an employee, but that employer is not necessarily sheltered from liability by the existence of one or more legitimate reasons. "[E]ven if an employer has a legitimate reason for the discharge, a plaintiff may nevertheless prevail if an illegitimate reason more likely than not motivated the discharge decision." *McGrath v. TCF Sav., FSB*, 509 N.W.2d 365, 366 (Minn. 1993) (quotation omitted). Courts apply a *McDonnell-Douglas* analysis to disparate-treatment claims under the MHRA in cases where a plaintiff alleges that an employer had a single illegitimate motive and in cases where an employer allegedly had illegitimate and legitimate motives (i.e. "mixed-motive" cases). *Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 626-27 (Minn. 1988).

Here, Pearson argues that the district court erred by not finding that respondents also had at least one illegitimate reason for reducing his pay and firing him, and that this illegitimate factor was a motivating factor underlying respondents' decisions. When the district court denied Pearson's motion for post-trial relief, it explained that it had "weigh[ed] the entirety of the evidence, testimony, and the credibility of the witnesses" in applying the *McDonnell-Douglas* test. The district court explicitly found that Pearson had failed to show that respondents' stated reasons for reducing Pearson's salary and

9

subsequently firing him were pretextual. The district court did not make a finding that any of the respondents' reasons were illegitimate or discriminatory. The court found that possible evidence of a discriminatory motive—Drapeau's statements over lunch regarding Pearson's age—"seem[ed] more likely to have been a tactless and clumsy attempt to give [Pearson] a way to gracefully accept a large reduction in salary and was not intended to pressure [Pearson] to resign because of [Pearson's] age." The district court's interpretation of Drapeau's statements is bolstered by other trial testimony indicating that respondents had already decided to cut Pearson's pay by the time Drapeau made the statements to Pearson at lunch.

The district court found that respondents also had legitimate reasons for firing Pearson, listing five factual findings supporting this conclusion. The court did not find that respondents had any illegitimate reasons for firing Pearson. Because there appears to be no finding that respondents had both legitimate and illegitimate reasons for reducing Pearson's salary or firing him, the court did not err in failing to parse which of respondents' reasons was a "motivating factor."

Pearson also argues that the district court erred in its application of the third prong of *McDonnell Douglas* by requiring him to disprove each and every reason respondents gave for their decision to reduce Pearson's salary and fire him. The district court did not place an improper burden on Pearson under *McDonnell Douglas*. The district court made credibility determinations, weighed all of the evidence, and found that respondents' reasons were legitimate and credible. When the burden subsequently shifted back to Pearson to show that these reasons were pretext, Pearson failed to convince the district court that

10

respondents' reasons were fabricated or that they harbored any illegitimate reasons for their actions. The district court did not err in its analysis under *McDonnell Douglas*.

Pearson also challenges a great many of the district court's factual findings. Perhaps the closest question regards whether Pearson's e-mail alleging age discrimination influenced respondents' decision to fire him. Pearson alleged age discrimination in an e-mail, sent the e-mail to Mason, and was fired the next day. This is certainly suspicious timing, and indeed, it was the basis for Pearson's prima facie case of reprisal. The timing of a discharge may raise the inference of a retaliatory motive. *Hubbard v. United Press Int'l*, 330 N.W.2d 428, 445-46 (Minn. 1983). The inference can be rebutted, however, and it does not by itself satisfy Pearson's burden of persuasion. *Id.* at 446.

The district court believed respondents' testimony that they had not opened Pearson's e-mail before they met on the morning of February 6, 2012 to discuss Beran and Mason's decision to fire Pearson. This testimony appears to conflict with Mason's testimony that he opened the e-mail and sent it to his attorney at 9:33 a.m. Drapeau stated that he arrived at the office that morning at 9:45 a.m. It would seem that Mason would have read the e-mail before meeting with Beran and Drapeau based on this evidence. Mason forwarded Beran and Drapeau a copy of Pearson's e-mail at 9:52 a.m. This indicates that the respondents only had a very short meeting about the decision to fire Pearson. Despite the evidence tending to show that respondents knew about the e-mail prior to or during their February 6 meeting, the district court found that other facts weighed against that interpretation. It credited respondents' testimony that the meeting was brief and that Mason and Beran had already talked at some length the week before and had

11

decided to fire Pearson. If they had already made the decision, it would be unnecessary to discuss it at length. Alternatively, if they had already made the decision to fire Pearson, even if they received the e-mail prior to or during the meeting, it would have no bearing on the decision. There is also evidence suggesting that Beran and Pearson did have a confrontation before February 6 that Pearson expected could lead to his discharge. Even if this court might view the evidence differently, it does not appear that the district court's findings lacked evidentiary support or were "manifestly contrary to the weight of the evidence." *Rogers v. Moore*, 603 N.W.2d 650, 656 (Minn. 1999) (quotation omitted).

**Constitutional right to a jury trial**

Pearson argues on appeal that the district court erred by denying him his constitutional right to a jury trial under the MHRA and Minn. Stat. § 181.81. The version of the MHRA in effect at the time Pearson commenced his suit limited him to a bench trial. "Any action brought pursuant to [the MHRA] shall be heard and determined by a judge sitting without a jury." Minn. Stat. § 363A.33, subd. 6. Pearson argues on appeal that the Minnesota Constitution entitles him to a jury trial, a right the legislature cannot deny him by statute.

"The right to a jury trial must be found either in the Minnesota Constitution or provided specifically by statute." *Schmitz v. U.S. Steel Corp.*, 852 N.W.2d 669, 673 (Minn. 2014) (quotation omitted). In this case, the relevant statute specifically denies the right to a jury trial, so if Pearson is entitled to a jury trial, that right must arise from the constitution. "Whether the Minnesota Constitution provides the right to a jury trial is a question of law that we review de novo." *Id.*

> To determine the right to a jury trial, we analyze current causes of action and pleading practices in the context of the theories of relief . . . and the jurisprudence at the time of the enactment of Minnesota's Constitution. We focus not on whether the exact cause of action existed, but on the *type* of action—whether the claim is an action at law, for which the Constitution guarantees a right to a jury trial, or an action in equity, for which there is no constitutional guarantee to a jury trial.

*Id.* (quotations and citation omitted).

This court has characterized the MHRA as providing "extensive equitable relief," noting that the statute "authoriz[es] the court to order reinstatement or promotion of a terminated plaintiff who has suffered employment discrimination." *Schmitz v. U.S. Steel Corp.*, 831 N.W.2d 656, 677-78 (Minn. App. 2013), *aff'd*, 852 N.W.2d 669 (Minn. 2014). Likewise, section 181.81 provides equitable relief. It allows a court to "enjoin further violations" of the statute, reinstate the plaintiff, or "compensat[e] [the plaintiff] for any period of unemployment resulting from the violation together with actual and reasonable attorney fees, and other costs incurred by the plaintiff." Minn. Stat. § 181.81, subd. 2(b). In *Schmitz*, the supreme court held that a retaliatory-discharge claim seeking only monetary damages is a cause of action at law with a constitutional right to a jury trial. *Schmitz*, 852 N.W.2d at 674. But where a claim seeks monetary damages and equitable relief, it is "not strictly legal in nature, and neither party is entitled to a jury trial." *Schmitz*, 831 N.W.2d at 675.

To determine the nature of the dispute and whether Pearson was entitled to a jury trial, this court considers "the pleadings as a whole." *Schmitz*, 831 N.W.2d at 677. In his complaint, Pearson did not limit his request for relief to monetary damages. He asked for

"all available compensatory damages including loss of past and future income, emotional distress, loss of reputation and related damages in an amount in excess of $50,000.00" and costs and attorneys' fees. Pearson also asked for "all relief available" under the MHRA and under section 181.81. These statutes provide for extensive equitable relief. Pearson's request for all of the relief available under these statutes constituted a request for equitable relief in addition to his specific request for compensatory damages. He was therefore not entitled to a jury trial under the MHRA as it existed at the time he commenced this action.

**Recorded statements**

Pearson argues that the district court erred and abused its discretion when it denied Pearson's motion to compel discovery of recorded statements made by two Shred Right employees to respondents' attorney. Before trial, the parties disagreed about whether respondents should make available three recorded statements that respondents' attorney took from three Rohn employees in preparation for trial. These statements were not made available to Pearson during discovery. Pearson argues that counsel took the statements for fact-finding purposes and as such, counsel should have identified their existence and should have expressly claimed privilege under Minn. R. Civ. P. 26.02(f).

The district court made the determination that the statements were protected from disclosure by Minn. Stat. § 595.02, subd. 1(b) (2012) and held that the fact that a stenographer was present did not constitute a waiver of this privilege. The record indicates that the district court did not address Pearson's rule 26.02 argument in its pretrial order. When Pearson raised the same issue in his motion for post-trial relief, the district court

14

stated that it had previously ruled on the issue and it "continue[d] to find that the suppression of these recordings [under] Minn. Stat. § 595.02, [s]ubd. l(b) was proper."

"The interpretation of the rules of civil procedure . . . is a question of law that [appellate courts] review de novo." *TC/Am. Monorail, Inc. v. Custom Conveyor Corp.*, 840 N.W.2d 414, 417-18 (Minn. 2013).

> [A] party may obtain discovery of documents and tangible things otherwise discoverable pursuant to Rule 26.02(b) and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

Minn. R. Civ. P. 26.02(d). But, where a non-party witness's statement is given to a party's attorney, the statement is "discoverable as of right, without a showing of need or inability to obtain [its] substantial equivalent." *Ossenfort v. Associated Milk Producers, Inc.*, 254 N.W.2d 672, 681 (Minn. 1977). In cases where a party's employee witnesses an accident and is not otherwise a party to a subsequent action, an attorney-client relationship does not arise when the employee gives a statement to the party's attorney during the course of general investigation. *Leer v. Chi., Milwaukee, St. Paul & Pac. Ry. Co.*, 308 N.W.2d 305, 309 (Minn. 1981). The *Leer* court's reasoning does not suggest that its holding is limited to situations where a party's employee gives statements to non-attorney investigators, as respondents argue. *Leer* reviewed a district court decision where non-party employee witnesses gave statements to the employer's non-attorney investigator. *Id.* at 306. But the

15

court based its reasoning in part on cases in which non-party employee witnesses gave statements to the employer's attorney who was hired after an accident. *Id.* at 308.

Here, respondents' attorney apparently took the three recorded statements in preparation for litigation. Before trial, the district court ordered respondents to make one of the three recorded statements available to Pearson because respondents had disclosed a portion of the statement in a district court filing. The two other recorded statements are at issue on appeal. Pearson would usually need to show a substantial need and undue hardship in order to access the statements under Minn. R. Civ. P. 26.02(d). But, according to *Leer*, the employees' statements were not protected by attorney-client privilege and, according to *Ossenfort*, Pearson did not need to make a special showing in order to attain them. The district court erred in denying Pearson's motion to compel discovery of the two recorded statements.

In *Ossenfort*, the court held that while the district court erred in denying discovery of a statement, defendants were not prejudiced by the error. 254 N.W.2d at 681. This court "must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Minn. R. Civ. P. 61. Two Shred Right employees made the statements. Pearson was able to depose and cross-examine the two employees. They testified during trial and were cross-examined by Pearson regarding their own sales records and their knowledge of Pearson's behavior in the workplace. Pearson therefore had access to information provided by the two employees through means other than their recorded statements. Because Pearson was not prejudiced by the district court's error, it is unnecessary for this court to remand on this issue.

16

**Use of court exhibits**

Pearson argues that the district court erred by relying on court exhibits in making its credibility determinations, findings, and conclusions of law. On appeal, Pearson specifically challenges the district court's references to Pearson's medical records, a background investigation report on Pearson, a general salary and sales summary, a summary of Pearson's sales accounts, and a monthly sales goal sheet for Rohn employees. Pearson challenged the district court's reference to these exhibits in his motion for post-trial relief. The district court denied Pearson's motion and explained that its references to court exhibits "were included only as a courtesy and reference tool for review by counsel . . . because of their convenience in locating and understanding the great amount of testimony in this case." The district court stated that "the cited court exhibits are supported by other admitted evidence or testimony received at trial."

"It is elementary that findings and conclusions of the trial court must be drawn from the evidence in the record." *Carlson Real Estate Co. v. Soltan*, 549 N.W.2d 376, 380 (Minn. App. 1996) (quotation omitted), *review denied* (Minn. Aug. 20, 1996). "This court will reverse a trial court's findings of fact if, upon review of the entire evidence, we are left with the definite and firm conviction that a mistake has been made." *Id.* (quotation omitted).

In this case, the district court had numerous sources of evidence to support its findings. Upon review of the entire record, it does not appear that the district court's factual findings were clearly erroneous. For example, Pearson argues that the district court improperly relied on records of his accounts and sales to find that he was not meeting sales

goals and therefore respondents had a legitimate reason to cut his salary. But there was other evidence to support the district court's finding that Pearson was not meeting expectations at work. Witness testimony indicated that Pearson believed he was terminated because he did not meet the $1 million sales goal that was set when he began work at Shred Right. Pearson complains that the district court relied on his medical records and a background report in deciding whether he was credible. The district court, however, considered multiple points of evidence regarding whether Pearson told respondents that he had retired from his previous job, or if he told them he had been fired. The district court was able to hear from Pearson himself and weigh his testimony against the testimony of respondents and other witnesses. The district court stated that it did not rely on court exhibits to make its decision. The large amount of evidence properly in the record is sufficient to support the district court's explanation of its factual findings and conclusions.

**Denial of motion for new trial**

Pearson argues that the cumulative effect of the district court's errors of law and fact necessitate a new trial. "We review a district court's new trial decision under an abuse of discretion standard." *Moorhead Econ. Dev. Auth. v. Anda*, 789 N.W.2d 860, 892 (Minn. 2010). Analysis of the foregoing issues indicates that the district court's only error was not prejudicial to Pearson. No errors have accumulated to the extent that the district court abused its discretion in denying Pearson a new trial.

**Affirmed.**

18