**Elizabeth FRIEND, Respondent,**

v.

**GOPHER COMPANY, INC., et al., Appellants.**

**No. A08–1810.**

Court of Appeals of Minnesota.

Aug. 25, 2009.

---

Stephen W. Cooper, Stacey R. Everson, The Cooper Law Firm, Minneapolis, MN, for respondent.

Jack E. Pierce, Tracy Halliday, Pierce Law Firm, P.A., Minneapolis, MN, for appellants.

Considered and decided by HALBROOKS, Presiding Judge; LANSING, Judge; and SHUMAKER, Judge.

## OPINION

LANSING, Judge.

In this appeal from judgment following a court trial of a claim under the Minnesota Human Rights Act, the employer asserts that the district court erred by finding discrimination on the basis of pregnancy. Because the district court's findings are insufficient to permit reasoned appellate review, we reverse and remand for further findings.

## FACTS

Gopher Company, Inc. employed Elizabeth Friend as a receptionist from October 2004 until August 2005. Jason Brouwer owns Gopher and made both the decision to hire Friend and to terminate her employment.

Friend's primary responsibility at Gopher was to answer the phones, a task that required her to be present in the office. Gopher did not have a written attendance policy at the time of Friend's employment. Employees understood, however, that regular attendance was expected and that they were to call Brouwer on his cell phone if they were unable to report to work.

Soon after Friend began working for Gopher, Brouwer noted problems with Friend's attendance—"either showing up late or not showing up at all." Gopher's office administrator testified that Friend was sometimes absent two or three times a week and characterized her attendance as "by far the worst [he had] seen since [he had] worked there." Another employee testified that Friend missed work approximately one time a week. Several employees testified that they had to answer phones when Friend was absent; and the added job responsibilities interfered with completing their own work. Brouwer's wife, who handles payroll for Gopher, testified that Friend worked 1,500.89 of 1,728 scheduled hours during her employment with Gopher.

Many of Friend's absences were related to an ongoing medical problem that was ultimately diagnosed and treated. But the evidence also included absences that were not attributable to medical reasons. Brouwer testified to his recollection of Friend being absent from work once because she missed the bus and once because she was moving. He testified that sometimes Friend gave no explanation at all for her absences. Brouwer also testified that sometimes Friend did not call when she missed work. Friend conceded that she did not have a doctor's appointment on all of the days that she missed work.

Brouwer testified that he had regular conversations with Friend about her poor attendance and that he "told her the importance of her job, the importance of being to work on time, and if she continued to be late or even not to show up, [he] was going to have to make a change." According to Brouwer, Friend's attendance improved after their discussions, but then deteriorated again: "It would go in spurts. I mean, she would be good for, you know, a number of weeks and then it would fall back off, and it was pretty irregular."

Brouwer testified that, toward the end of June, he discussed Friend's attendance

issues with her again. Brouwer testified that he showed Friend a written discipline-documentation form that he had filled out for her. The document has a place for Friend's acknowledgment, but her signature does not appear on the document. Brouwer testified that he neglected to obtain it. Friend testified that Brouwer had never discussed attendance issues with her and that she had never seen the discipline documentation form.

At the beginning of August 2005, Friend learned that she was pregnant. Friend shared her news with her co-workers. Brouwer learned of the pregnancy, but it is disputed whether Friend told Brouwer directly. Friend testified that she told Brouwer and that he said "congratulations" and immediately told her to get back to work.

Concerned about the impact that Friend's pregnancy would have on the business, Brouwer discussed the situation with his wife. Brouwer's wife worked full-time for Gopher until the birth of their first child, took six months off, and then came back to work approximately one day a week. No witness could identify any other employee who continued working at Gopher following a pregnancy, but no evidence indicated the number of individuals who had become pregnant while employed by Gopher. Testimony established that a telemarketer left while pregnant, but Gopher's marketing director testified that he was considering terminating that employee based on problems with her attendance and attitude.

Brouwer testified that he considered options including "put[ing] [Friend] in one of the back rooms and allow[ing] her to do paperwork back there and bring[ing] somebody else in to be the receptionist or try[ing] to get a replacement in the morning . . . [since] she usually was in by 10 or 11." Brouwer also approached another

Gopher employee about the possibility of job-sharing with Friend. Brouwer never discussed with Friend how the pregnancy might impact her ability or desire to work.

Friend had good attendance the first two weeks of August 2005. But on August 16, 2005, Friend experienced "very extreme stomach pain," and feared a miscarriage. Friend called Brouwer to advise him that she intended to go to the emergency room and would not be in to work that day. Friend spent most of the day at the hospital; physicians ran several tests and instructed Friend to follow up with her regular doctor the next day. Friend called Brouwer to advise him that she would not be at work until after she saw her doctor the next day. According to Friend, Brouwer told her that "he had talked to his wife and that stomach pains were a normal part of pregnancy" and that he expected her to report for work the next day.

Friend saw her doctor at 9 a.m. on August 17, 2005. When she returned home, there was a message on her answering machine from Brouwer telling her that she no longer had a job and could pick up her belongings the following day. Friend called Brouwer and said she "suppose[d she did]n't have a job anymore," and Brouwer told her that was correct. Friend brought this action against Gopher and Brouwer (collectively Gopher) for pregnancy discrimination.

Through written findings of fact and conclusions of law, the district court held Gopher liable for pregnancy discrimination. The district court acknowledged Friend's attendance issues—finding that she missed more than two weeks of work and worked only eighty-six percent of her scheduled hours between October 11, 2004 and February 4, 2005—but nevertheless found that while "[Friend] had been missing work occasionally, . . . her pregnancy

was the factor that had changed[,] causing [Gopher] to terminate her employment." The court based this finding on Brouwer's admission that "part of his business concerns were, '. . . the potential impact the pregnancy would have on the business in the future.' "

In addition to challenging the district court's liability findings, Gopher disputes the damages amount for emotional distress and the inclusion of a mediation fee in the allocation of costs. By notice of review, Friend challenges the calculation of backpay and the amount allocated for attorneys' fees.

## ISSUE

Did the district court err by finding that Gopher terminated Friend's employment because of her pregnancy?

## ANALYSIS

The Minnesota Human Rights Act (MHRA) prohibits an employer from discharging an employee on the basis of sex, Minn.Stat. § 363A.08, subd. 2 (2008), which is expressly defined to include "pregnancy, childbirth, and disabilities related to pregnancy or childbirth." Minn.Stat. § 363A.03, subd. 42 (2008). Friend asserted her discrimination claim under a disparate-treatment theory, which required her to prove that her pregnancy "actually motivated" Gopher's decision to terminate her employment. *Goins v. West Group,* 635 N.W.2d 717, 722 (Minn.2001); *see also Anderson v. Hunter, Keith, Marshall & Co., Inc.,* 417 N.W.2d 619, 624 (Minn.1988) (holding that protected trait must be "a substantial causative factor").

■ In an appeal from judgment following a court trial, we defer to the district court's findings of fact unless clearly erroneous. Minn. R. Civ. P. 52.01; *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 441 (Minn.1983). But we do not defer to the district court's decisions on purely legal questions. *Kohn v. City of Minneapolis Fire Dep't,* 583 N.W.2d 7, 11 (Minn. App.1998), *review denied* (Minn. Oct. 20, 1998).

■ Employment-discrimination claims asserting disparate treatment proceed under one of two evidentiary frameworks. *See, e.g., Goins,* 635 N.W.2d at 722–24 (contrasting two methods of proof). The most frequently applied framework is the shifting-burdens analysis first articulated by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This framework requires a plaintiff to establish a prima facie case of discrimination and prove that an employer's proffered reason for a challenged employment decision is a pretext for discrimination. *See, e.g., Sigurdson v. Isanti County,* 386 N.W.2d 715, 720 (Minn.1986) (describing burdens of proof and production under *McDonnell Douglas* framework). Although the prima facie case varies depending on the type of employment decision that is challenged, its purpose is to disprove the most obvious legitimate bases for the employment decision, thereby allowing the inference that the decision was motivated by discrimination. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). Thus, under *McDonnell Douglas,* discrimination is proved indirectly, or circumstantially. *See Sigurdson,* 386 N.W.2d at 720 (stating that *McDonnell Douglas* test allows discriminatory motive to be "indirectly inferred").

■ Under the second framework for proving a disparate-treatment claim, the plaintiff relies on "direct evidence" that discrimination was the basis for the employment decision. *Goins,* 635 N.W.2d at

722. In contrast to the process of elimination that takes place under *McDonnell Douglas*, direct-evidence cases are adjudicated based on the strength of affirmative evidence of discriminatory motive. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir.1994). A plaintiff proceeding under a direct-evidence framework need not establish a *McDonnell Douglas* prima facie case. *See Hoover v. Norwest Private Mortgage Banking*, 632 N.W.2d 534, 542 (Minn.2001) (explaining that MHRA plaintiff may proceed using direct evidence or *McDonnell Douglas* framework); *cf. Sigurdson*, 386 N.W.2d at 720 (stating that prima facie case may be satisfied through direct evidence). The direct-evidence framework has been less frequently applied, and, as we discuss later in this analysis, confusion exists over the nature of evidence necessary to support a claim under this framework.

The primary difficulty in this appeal is determining under which framework the district court found Gopher liable. The district court's decision recites the *McDonnell Douglas* test for discriminatory discharge, which requires a plaintiff to show that (1) she was a member of a protected class; (2) she was qualified for the position from which she was discharged; and (3) she was replaced by a nonmember of the protected class. *Hoover*, 632 N.W.2d at 542. Despite that recitation, however, the court failed to make two of the requisite findings under that test: that Friend was qualified for the position from which she was discharged and that she was replaced by a nonmember of the protected class.

■ Typically, the absence of express findings required under the *McDonnell Douglas* test dictates remand to the district court. *See Sigurdson*, 386 N.W.2d at 721–22 (requiring express findings on each stage of the *McDonnell Douglas* analysis); *Bersie v. Zycad Corp.*, 399 N.W.2d 141,

146 (Minn.App.1987) (remanding for further *McDonnell Douglas* findings). But Friend asserts that the district court's findings can be affirmed under a direct-evidence framework, based on Brouwer's testimony that he was concerned about Friend's pregnancy and considered changing her employment status based on those concerns. Gopher counters by asserting that Brouwer's testimony is not direct evidence. We agree that Brouwer's testimony is not direct evidence in the strictest legal sense. *See, e.g., Black's Law Dictionary* 636 (9th ed.2009) (defining direct evidence as that which "proves a fact without inference or presumption"). Thus, we must determine whether the direct-evidence framework is limited to claims based only on direct—as opposed to circumstantial—evidence.

■ Neither the Minnesota Supreme Court nor this court has addressed the type of evidence that is required for proof under a direct-evidence framework. When statutory text and purposes are aligned, we may derive guidance for applying the MHRA from federal caselaw interpreting Title VII. *Compare Anderson*, 417 N.W.2d at 624 (noting general adherence to Title VII precedents) *with Ray v. Miller Meester Adver., Inc.*, 684 N.W.2d 404, 408–09 (Minn.2004) (identifying cases in which the court has rejected federal precedents as inconsistent with "more onerous" requirements of MHRA). Thus, we next consider the federal caselaw on this issue and whether it provides guidance in these circumstances. *See Wenigar v. Johnson*, 712 N.W.2d 190, 205 (Minn.App.2006) (stating that "it is appropriate to call on the interpretations of the federal anti-discrimination statutes when the provisions of the federal statute and the MHRA are similar").

Until recently, federal appellate courts disagreed on the nature of evidence neces-

sary to support a disparate-treatment claim outside the *McDonnell Douglas* context. The debate found its origins in Justice O'Connor's concurrence in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In that case, a plurality of the U.S. Supreme Court adopted a separate standard for so-called "mixed motive" cases, in which both legitimate and illegitimate reasons motivated the employment decision. *Id.* at 244, 109 S.Ct. at 1787–89. The plurality held that an employer could avoid liability in these cases "by proving that it would have made the same decision even if it had not allowed [the protected trait] to play … a role." *Id.* at 244–45, 109 S.Ct. at 1787–88. In a concurring opinion, Justice O'Connor stated that "the burden on the issue of causation" should shift only upon presentation of "direct evidence that an illegitimate criterion was a substantial factor in the decision." *Id.* at 276, 109 S.Ct. at 1804. This concurrence suggested that a plaintiff could not pursue a disparate-treatment claim outside the *McDonnell Douglas* context unless the plaintiff presented direct evidence that discrimination was a basis for the employment decision.

Three years before the *Price Waterhouse* decision, the Minnesota Supreme Court declined to adopt in MHRA cases the same-decision analysis that the federal appellate courts had been applying in mixed-motive cases under Title VII. *See Anderson*, 417 N.W.2d at 626–27. The court reasoned that allowing employers to limit or avoid liability based on a same-decision analysis would "defeat the broad remedial purposes of the [MHRA] by permitting employers, definitionally guilty of prohibited employment discrimination, to avoid all liability for the discrimination provided they can prove that other legitimate reasons may coincidentally exist that could have justified the discharge." *Id.* at 626. While *Anderson* anticipatorily repudiated the burden-shifting portion of the *Price Waterhouse* holding, the implications affecting the nature of evidence required to support a disparate-treatment claim outside the *McDonnell Douglas* context remained relevant.

The *Price Waterhouse* decision led to a dozen years of debate among the federal appellate courts over the type of evidence a plaintiff was required to present in order to proceed under a direct-evidence framework. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 95, 123 S.Ct. 2148, 2151–52, 156 L.Ed.2d 84 (2003) (summarizing split of authorities).[1] Even courts allowing circumstantial evidence continued to use the direct-evidence label, with an occasional acknowledgement that the label was "somewhat of a misnomer." *Walden v. Georgia–Pacific Corp.*, 126 F.3d 506, 513 (3d Cir.1997). The Seventh Circuit alone changed its terminology, referring to a direct *method* of proving discrimination through direct and/or circumstantial *evidence*. *See Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir.2003) (explaining terminology and acknowledging that "[t]here are several cases that arguably conflate the direct *method* with direct *evidence*" (emphasis added)). The Seventh Circuit held that a plaintiff could succeed under the direct method by presenting a "convincing mosaic" of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker. *Troupe*, 20 F.3d at 737.

---

**1.** This debate was altered but not extinguished by the passage of the Civil Rights Act of 1991, which amended Title VII to provide for liability in mixed-motive cases, but limited the remedies available in same-decision cases. *See Desert Palace*, 539 U.S. at 94, 123 S.Ct. at 2151.

In 2003, the U.S. Supreme Court held that circumstantial evidence could support a mixed-motive, disparate-treatment claim. *See Desert Palace*, 539 U.S. at 98–101, 123 S.Ct. at 2153–55. The Court explained that Title VII imposes no special evidentiary burden and thus concluded that discrimination claims should be governed by "conventional rule[s] of civil litigation" requiring proof by a preponderance of evidence using direct or circumstantial evidence. *Id.* at 99, 123 S.Ct. at 2154 (internal quotations omitted). In so holding, the Court expressly acknowledged the "utility of circumstantial evidence in discrimination cases," explaining that "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Id.* at 100, 123 S.Ct. at 2154 (quotation omitted); *see also Gross v. FBL Fin. Servs., Inc.,* —— U.S. ——, —— n. 4, 129 S.Ct. 2343, 2351 n. 4, 174 L.Ed.2d 119 (2009) (explaining that "no heightened evidentiary requirement" is required to establish liability under Age Discrimination in Employment Act).

We conclude that the U.S. Supreme Court's holding in *Desert Palace* should apply with equal force under the MHRA. Like Title VII, the MHRA includes no statutory language limiting the types of evidence that may be used to prove a discrimination claim. And like the federal common law cited in *Desert Palace*, Minnesota law "makes no distinction between circumstantial and direct evidence as to the degree of proof required." *State v. Armstrong*, 257 Minn. 295, 312, 101 N.W.2d 398, 409 (1960); *see also Ill. Farmers Ins. Co. v. Brekke Fireplace Shoppe, Inc.*, 495 N.W.2d 216, 220 (Minn. App.1993) (holding that direct evidence is not required in civil negligence action). Accordingly, we conclude that a plaintiff may prove a claim under the direct-evidence framework—perhaps more appropriately understood as the direct method—through either direct or circumstantial evidence, or a combination of the two.

Unfortunately, our conclusion that a discrimination claim can be pursued under the direct method using circumstantial evidence does not resolve the issue in this case because we remain uncertain whether the district court intended to proceed under that framework. Our review is further hampered by the absence of credibility findings or other findings that resolve or weigh the conflicting testimony at trial. Thus, we conclude that the findings are insufficient to permit effective appellate review and we remand for the district court to make further findings. In those findings, the district court should expressly identify the evidentiary framework under which it is evaluating Friend's claims and make all findings requisite to the identified framework. Given the need for further findings, we do not, at this point, determine the sufficiency of the evidence to support a claim under either framework. *See Whitaker v. 3M Co.*, 764 N.W.2d 631, 640 n. 1 (Minn.App.2009) (explaining that "our role as an [appellate] court does not extend to making factual findings in the first instance").

Our remand for further findings makes it unnecessary for us to reach the remaining issues raised by Friend and Gopher, including the challenges to the district court's determinations on damages and attorneys' fees. Nevertheless, we make the following observations to aid the district court and the parties in resolving these issues without the need for additional appeal and possible remand. Principally, we note the district court's broad discretion in determining appropriate damages. *Holiday Recreational Indus., Inc. v. Manheim Servs. Corp.*, 599 N.W.2d 179, 183 (Minn.App.1999); *see*

*also Kohn,* 583 N.W.2d at 15 (stating that findings of fact related to damages, like other findings, are reviewed for clear error). This discretion extends to determining whether, and at what point, an award of backpay would become speculative. *Jackson v. Reiling,* 311 Minn. 562, 563, 249 N.W.2d 896, 897 (1977), *cert. denied* 432 U.S. 906, 97 S.Ct. 2951, 53 L.Ed.2d 1078 (1977). The district court likewise has discretion to determine an appropriate award of attorneys' fees. *Shepard v. City of St. Paul,* 380 N.W.2d 140, 143 (Minn.App.1985). That discretion may, however, be abused if the district court fails to properly apply the lodestar analysis adopted by the Minnesota courts for determining appropriate fee awards. *Id.* Thus, on remand, we encourage the district court to ensure that its findings relative to the award of attorneys' fees comport with these standards.

## DECISION

Because the district court did not make sufficient findings to facilitate appellate review under either a *McDonnell Douglas* or direct-evidence framework, we remand for further findings consistent with this opinion.

**Reversed and remanded.**