*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0620**

James Clarke,
Appellant,

vs.

Northwest Respiratory Services, LLC,
Respondent.

**Filed January 30, 2017
Affirmed
Hooten, Judge**

Ramsey County District Court
File No. 62-CV-15-3091

Daniel Gray Leland, Leland Law PLLC, Minneapolis, Minnesota (for appellant)

William E. Flynn, Kelly G. Laudon, Sarah E. Pruett, Lindquist & Vennum LLP, Minneapolis, Minnesota (for respondent)

Considered and decided by Hooten, Presiding Judge; Peterson, Judge; and Larkin, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HOOTEN**, Judge

Appellant challenges the district court's dismissal of his complaint on summary judgment, arguing that he raised genuine issues of material fact with regard to his claims of illegal discrimination in violation of the Minnesota Human Rights Act (MHRA), Minn.

Stat. §§ 363A.01–.44 (2016), and retaliation in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601–54 (2012). We affirm.

**FACTS**

In 2008 or 2009, appellant James Clarke, a Gulf War veteran, was diagnosed with posttramautic stress disorder (PTSD) and received a 50% disability rating from the United States Veterans Administration. Clarke began working for respondent Northwest Respiratory Services, LLC, on January 9, 2012. Northwest provides oxygen, respiratory, and sleep therapy equipment and services to its customers. Clarke worked as a service technician for Northwest, and his duties included delivering oxygen tanks and other equipment to customers, servicing the equipment, and educating customers on proper use and care of the equipment.

Clarke received a number of warnings during his employment with Northwest. In March 2012, a person called Northwest to report that Clarke was driving recklessly and "like a maniac." Clarke was told to drive more carefully. In October 2012, Northwest issued a verbal warning to Clarke for failing to keep his vehicle maintained. The warning stated that "any other incidents [of] this nature will result in a written warning or even up to termination."

Clarke received multiple complaints about his driving in a several month period in early 2013. In February 2013, a person reported that Clarke was driving "right on his bumper," and Northwest told Clarke to make sure to leave enough space between vehicles. In April 2013, a person complained that Clarke was driving too close to his vehicle, and Northwest warned Clarke about his driving habits. In May 2013, a person reported that

2

Clarke was tailgating her and went through a stop sign. On that same day, Clarke was on the phone with Northwest regarding the tailgating complaint when another person called Northwest to report that Clark had cut her off, not used a blinker, and almost ran her off the road. In response to the fact that four individuals had complained of Clarke's driving within four months, as well as the fact that Northwest had recorded several incidents of Clarke driving over the speed limit, Northwest issued a final written warning to Clarke in June 2013. The warning stated that "[a]ny further inciden[ts] will result in termination from Northwest."

In late November 2013, Clarke submitted to Northwest a certification of violations that stated that he had received a speeding ticket in July 2013. One of Clarke's supervisors, Caleb Peterson, wrote that "[Clarke] is walking a fine line and will be unemployable by [Northwest] if he incurs another violation. He has been made aware of this." Clarke had received another speeding ticket in early November 2013, but did not disclose the ticket on his certification of violations or tell Peterson of the ticket.

Clarke decided to attend inpatient treatment in December 2013 to treat his PTSD and requested FMLA leave from Northwest, which Northwest granted. Clarke took FMLA leave from December 31, 2013, to March 5, 2014.

In early January 2014, Northwest received a complaint from a customer regarding Clarke. The customer, who was calling to request a refill from Northwest, specifically asked that Clarke no longer be his driver, stating that Clarke was rude, talked back to him, slammed the door, and "made it a really uncomfortable experience." Because Clarke was on FMLA leave at the time the complaint was received, Christopher Larson, Northwest's

3

vice president of operations, noted that the issue would be addressed with Clarke when he returned from leave.

Shortly after Clarke returned to work, Carlos Trevino, one of Clarke's immediate supervisors, completed a performance evaluation of Clarke. Due to an oversight by Larson, Trevino was unaware of the January 2014 complaint at the time of the evaluation. The performance evaluation stated that Clarke was dependable, flexible, and efficient, but noted that Northwest had received a number of complaints concerning Clarke's driving. Clarke testified that, when he met with Trevino to review the performance evaluation, Trevino stated that Northwest was concerned about Clarke's driving because Clarke was transporting dangerous materials.

Approximately two weeks after returning to work, Clarke, while temporarily working out of Northwest's Windom office, was at the Mankato home of an elderly customer to deliver equipment. Some of the required equipment had not been loaded on Clarke's vehicle, so Clarke had to leave the residence and return to Windom to pick up additional equipment before completing delivery. The customer's daughter was unhappy with Clarke's service and lodged a complaint with a clinic that was a source of referrals for Northwest. The customer's daughter reported that Clarke was rude when he first arrived at the customer's home and continued to be very rude upon his return. The daughter complained that Clarke, in going over the instruction checklist, checked off everything, including that he had provided equipment that he had not provided. Because of the experience with Clarke, the customer's daughter cancelled Northwest's services.

4

The clinic informed Northwest of the incident by making a complaint (the Windom complaint). Trevino was informed of the complaint on March 27, 2014. Trevino brought the complaint to Larson's attention. Larson followed up with the clinic and the customer's daughter, who both reaffirmed their earlier complaints. Larson testified that, after receiving the Windom complaint, he reviewed Clarke's file and noted that he had received a prior complaint in January 2014 indicating his difficulty in dealing with customers and had received a final warning approximately nine months earlier based on complaints regarding his driving. Larson testified that, after looking at the totality of the past complaints and warnings in conjunction with the Windom complaint, he decided to terminate Clarke's employment. Because Larson was leaving for vacation, Larson instructed Trevino to notify Clarke of the termination of his employment.

On March 28, Trevino informed Clarke that his employment was being terminated. Clarke testified that Trevino stated that he did not agree with the decision, but the front office could not "risk" having Clarke work at Northwest due to the complaints and his recent "time off." Both Clarke and Trevino signed a termination notice stating that Clarke's employment with Northwest was being terminated due to rude behavior toward a customer, as well as multiple complaints from other drivers.

In July 2014, Clarke sued Northwest, alleging disability discrimination in violation of the MHRA and retaliation in violation of the FMLA. Northwest moved for summary judgment, and the district court granted Northwest's motion and dismissed Clarke's complaint. This appeal followed.

**D E C I S I O N**

Summary judgment is appropriate when the record "show[s] that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. Appellate courts "review a district court's grant of summary judgment de novo to determine whether any genuine issue of material fact exists and whether the district court erred in applying the law." *Larson v. Nw. Mut. Life Ins. Co.*, 855 N.W.2d 293, 299 (Minn. 2014). We view the evidence in the light most favorable to the party against whom summary judgment was granted. *McIntosh Cty. Bank v. Dorsey & Whitney, LLP*, 745 N.W.2d 538, 545 (Minn. 2008).

Minnesota law provides that "it is an unfair employment practice for an employer" to discharge an employee because of disability. Minn. Stat. § 363A.08, subd. 2 (2016).

> "Disability" means any condition or characteristic that renders a person a disabled person. A disabled person is any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment.

Minn. Stat. § 363A.03, subd. 12 (2016). A claim of employment discrimination will survive summary judgment if supported by either (1) direct evidence of discrimination or (2) sufficient circumstantial evidence in accordance with the three-part framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). *See Hansen v. Robert Half Int'l, Inc.*, 813 N.W.2d 906, 918 (Minn. 2012) (providing that claims under MHRA not involving direct evidence of discrimination are subject to *McDonnell* framework).

6

**Direct Evidence Method**

First, we must consider Clarke's argument that the district court erred in determining that Clarke failed to present evidence allowing him to pursue the direct method of proving discrimination.

If a plaintiff presents direct evidence of discrimination, the *McDonnell Douglas* analysis is unnecessary. *Arraleh v. Cty. of Ramsey*, 461 F.3d 967, 974–75 (8th Cir. 2006). "In contrast to the process of elimination that takes place under *McDonnell Douglas*, direct-evidence cases are adjudicated based on the strength of affirmative evidence of discriminatory motive." *Friend v. Gopher Co.*, 771 N.W.2d 33, 38 (Minn. App. 2009). "A plaintiff may prove a claim under th[e] direct method through either direct or circumstantial evidence, or a combination of the two." *LaPoint v. Family Orthodontics, P.A.*, 872 N.W.2d 889, 893 (Minn. App. 2015) (quotation omitted).

"Courts have found direct evidence of discriminatory motive where a statement or policy is discriminatory on its face." *Goins v. W. Grp.*, 635 N.W.2d 717, 722 (Minn. 2001). "Direct evidence is evidence showing a *specific link* between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *LaPoint*, 872 N.W.2d at 893 (alteration omitted) (quotation omitted). "In this context, whether evidence is direct depends on its causal strength." *Id.* (quotation omitted). "Statements made by individuals who do not take part in the decision to discharge an employee . . . cannot be direct evidence of discrimination." *Diez v. Minn. Mining & Mfg.*, 564 N.W.2d 575, 579 (Minn. App. 1997), *review denied* (Minn. Aug. 21, 1997).

The only direct evidence Clarke presents of discrimination is Trevino's statement that Clarke's time off was a reason for his termination.[1] There is no dispute that Larson made the decision to terminate Clarke's employment and instructed Trevino to notify Clarke of the termination. To conclude that Trevino's statement evidences Larson's discriminatory animus one must infer that Larson knew that Clarke had PTSD and told Trevino that one of the reasons that Clarke's employment was being terminated was because he had taken time off. Clarke presented no evidence suggesting that Larson knew that Clarke had PTSD. Therefore, Trevino's statement, by itself, is not sufficient evidence to fulfill the direct evidence method of proving Clarke's claim, as it does not directly demonstrate that Larson had a discriminatory motive in deciding to terminate Clarke's employment. *See Bakhtiari v. Lutz*, 507 F.3d 1132, 1135 n.3 (8th Cir. 2007) ("The term 'direct evidence,' as used, is simply evidence, which if believed, proves the existence of a fact in issue without inference or presumption.").

Moreover, this evidence, combined with the circumstantial evidence, does not present a "convincing mosaic" of discrimination sufficient to proceed under the direct method. *See Friend*, 771 N.W.2d at 39. While Clarke's employment was terminated approximately three weeks after he returned from FMLA leave, his employment was terminated the day after Larson became aware that a customer had made a complaint against Clarke to a clinic that was a source of referrals for Northwest. Upon reviewing

---

[1] Trevino denies telling Clarke that his time off was a reason for his termination. For purposes of this appeal, however, the evidence must be viewed in the light most favorable to Clarke. *See McIntosh Cty. Bank*, 745 N.W.2d at 545. Therefore, we assume that Trevino referred to Clarke's time off as a reason for his termination.

Clarke's file, Larson noted that Clarke had received a similar complaint approximately two months earlier and made the decision to terminate Clarke's employment. Absent any evidence that Larson told Trevino that he decided to fire Clarke because of his FMLA leave or that Larson even knew that Clarke had PTSD, we conclude that Trevino's comment that Clarke was being fired for taking time off does not amount to direct evidence of discrimination.

### *McDonnell Douglas* **Framework**

When direct evidence of discriminatory motive is unavailable, the *McDonnell Douglas* framework provides a "means by which discriminatory motive may be indirectly inferred." *Sigurdson v. Isanti Cty.*, 386 N.W.2d 715, 720 (Minn. 1986). Under the three-part *McDonnell Douglas* test, the plaintiff bears the initial burden of making a prima facie case of discrimination. 411 U.S. at 802, 93 S. Ct. at 1824. The burden then "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* "If the [employer] provides a legitimate, nondiscriminatory reason for its actions, the presumption of discrimination disappears and the plaintiff has the burden of establishing that the employer's proffered reason is a pretext for discrimination." *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 542 (Minn. 2001); *see also McDonnell Douglas*, 411 U.S. at 804, 93 S. Ct. at 1825.

**A. Prima Facie Case of Disability Discrimination under the MHRA**

In order to make a prima facie case of discriminatory discharge, a plaintiff must show that he: "(1) is a member of a protected class; (2) was qualified for the position from which [he] was discharged; and (3) was replaced by a non-member of the protected class." *Hoover*, 632 N.W.2d at 542 (alteration omitted) (quotation omitted). Only the first element is in dispute here.

Clarke argues, and the district court agreed, that he is a disabled person under the statutory standard. For the purposes of this appeal, we will assume, without deciding, that Clarke is a disabled person and that, therefore, he has presented a prima facie case of disability discrimination.

## B. Prima Facie Case of FMLA Retaliation

The FMLA provides that an employee shall be entitled to 12 weeks of leave during any 12-month period if the employee meets certain statutory requirements and prohibits employers from interfering with, restraining or denying the exercise of or the attempt to exercise FMLA rights or discharging an individual for opposing practices made unlawful by the FMLA. 29 U.S.C. §§ 2612(a)(1), 2615(a) (2012). Establishing a prima facie case is not onerous. *Dietrich v. Canadian Pacific Ltd.*, 536 N.W.2d 319, 323 (Minn. 1995). In order to establish a prima facie case of wrongful retaliation, "an employee must show: (1) that he engaged in activity protected under the [FMLA], (2) that he suffered a materially adverse employment action, and (3) that a causal connection existed between the employee's action and the adverse employment action." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1007 (8th Cir. 2012). There is no dispute that Clarke fulfills

the first two prongs of establishing a prima facie case, as he was entitled to take leave under the FMLA and his employment was subsequently terminated.

Regarding the third prong, Northwest argues that Clarke failed to establish a causal connection between his taking FMLA leave and the termination of his employment. "[A] prima facie case requires only a minimal showing before shifting the burden to the employer" to provide a nondiscriminatory reason for its adverse employment action. *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001). Northwest suggests that the causal connection in this case is merely the temporal proximity between Clarke's return from FMLA leave and his termination and points out that the Eighth Circuit has stated that it "looks to the date an employer knew of an employee's use (or planned use) of FMLA leave, not the date it ended" in evaluating temporal proximity. *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012). Clarke requested FMLA leave in December 2013 and his employment was terminated on March 28, 2014. Northwest suggests that this temporal proximity is too attenuated to satisfy the causal connection requirement, citing *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014), for the proposition that "temporal proximity must be extremely close to establish the causal connection without other evidence of discriminatory animus." While it is possible that the temporal proximity may not be enough to establish a causal connection in this case, we need not decide whether the temporal proximity by itself is sufficient because here there is other evidence of discriminatory animus, namely Trevino's statement regarding Clarke's time off. We agree with the district court that the timing and the

11

inferences created by Trevino's statement are sufficient to present a prima facie case of FMLA retaliation.

### C. Nondiscriminatory Reason for Termination

The district court determined that Northwest provided a nondiscriminatory reason for the termination decision, and Clarke does not dispute this on appeal. Northwest contends that Clarke was terminated because Larson received a complaint the day before the termination that Clarke provided poor customer service and was rude, causing a customer to discontinue services with Northwest. Because this reason is legitimate and nondiscriminatory, we conclude that Northwest has rebutted Clarke's prima facie case of disability discrimination under the MHRA and FMLA retaliation.

### D. Pretext for Discrimination

"Once an employer articulates a legitimate, nondiscriminatory reason for the adverse employment action, the burden returns to the employee to demonstrate that the articulated reason is a pretext for discrimination." *Aase v. Wapiti Meadows Cmty. Techs. & Servs., Inc.*, 832 N.W.2d 852, 859 (Minn. App. 2013). This burden "merges with the ultimate burden of persuading the court that [the employee] has been the victim of intentional discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095 (1981). An employee may sustain this burden "either directly by persuading the court that a discriminatory reason likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence." *Aase*, 832 N.W.2d at 859 (quotation omitted). "Either route amounts to showing that a prohibited

12

reason, rather than the employer's stated reason, actually motivated the employer's action." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011).

The burden of establishing pretext requires more substantial evidence than that required to establish a prima facie case "because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification. A court may therefore conclude that in light of the employer's non-discriminatory rationale, the plaintiff's evidence does not permit a reasonable inference of discrimination." *Sprenger*, 253 F.3d at 1111 (citation omitted).

Clarke believes several circumstances demonstrate that Northwest's stated reason was a pretext for discrimination: (1) he produced evidence putting into question the significance of the Windom complaint; (2) he was treated less favorably than other employees involved in events relating to the Windom complaint; (3) he was treated less favorably than other service technicians who engaged in comparable or more serious misconduct; and (4) Northwest deviated from its policies in terminating him.

As the district court acknowledged, Clarke presented evidence putting into question the significance of the Windom complaint as it related to the termination decision. Specifically, Clarke presented evidence that the equipment problems were not his fault, the complaining customer was unhappy from the start, and the referral source was just as frustrated with Northwest's customer service representative as it was with him. However, it is undisputed that the customer complained to the clinic, Northwest's referral source, the customer stated that Clarke had been very rude, the customer cancelled Northwest's services, and the customer had not had contact with any other Northwest employee. While

13

Clarke may have created a question regarding his fault for some of the circumstances that may have caused the customer to complain, this does not create a question regarding whether Northwest's stated reason for termination has a basis in fact.

Clarke next points to the actions of other Northwest employees and Northwest's more lenient response to those employees' actions as evidence that a material issue of fact exists regarding whether Northwest's reason for his termination was pretext. First, Clarke states that two other employees were involved in the Windom complaint but were not disciplined. Clarke alleges that the clinic complained about a customer services representative who did nothing in response to the clinic's report of the customer's complaint, despite the clinic contacting the representative three times. Clarke also states that the Windom branch manager failed to perform his basic duties and failed to return phone calls, causing or exacerbating the circumstances that led to the customer's complaint.

"In proving pretext by showing that similarly situated employees were treated more leniently, the plaintiff's comparators must be similarly situated in all relevant respects." *Ebersole*, 758 F.3d at 925 (quotations omitted). The standard for determining if employees are similarly situated is "rigorous." *Cronquist v. City of Minneapolis*, 237 F.3d 920, 928 (8th Cir. 2001) (quotation omitted). "The comparators must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Ebersole*, 758 F.3d at 925 (quotation omitted).

14

From our review of the record, it is unclear whether the Windom branch manager or the customer services representative received any warning or other disciplinary action because of his or her actions leading up to the Windom complaint. Whether they were disciplined or not, however, the branch manager and the customer services representative are clearly not similarly situated to Clarke: they had different jobs and duties, they engaged in different conduct, and it is unclear whether they were subject to the same standards.

Clarke also contends, however, that other service technicians were treated more leniently than him for comparable or more serious misconduct, pointing to the disciplinary files of 21 other service technicians. We conclude that Clarke has failed to identify any valid comparators.

First, it is not clear that Clarke had the same supervisor as a number of the other service technicians. Some of the other employees worked at different branches than Clarke. Clarke contends that "[i]t is undisputed that Larson reviews *all* complaint forms regarding service technicians and determines how they should proceed." Larson testified that when Northwest receives a complaint concerning the conduct or performance of its service technicians he either investigates the report himself or delegates another manager to respond to the complaint. Therefore, while it is clear that Larson determined who would handle the complaint, himself or another manager, it is not clear that all of the service technicians had the same supervisor determining the appropriate disciplinary action. Moreover, it is not clear that any of the other employees engaged in the same conduct without mitigating or distinguishing circumstances, much less engaged in conduct that resulted in a customer discontinuing Northwest's services.

15

Even if the other service technicians could be considered as having the same supervisor, while a number of other service technicians received complaints of rude behavior toward customers, Clarke has failed to point out a comparator who received more lenient disciplinary action after receiving two customer complaints of rude behavior as well as a final written warning after multiple driving complaints. Rather, the record reflects that the only other service technician who had multiple complaints of unacceptable interactions with customers and multiple driving violations was terminated from Northwest.

Finally, Clarke argues that he has proved pretext because Larson failed to ask Clarke for his version of the customer complaint, contrary to Northwest's policy. "An employee may prove pretext by demonstrating . . . that the employer deviated from its policies." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006). There was some evidence that it was part of Northwest's policies to ask for the employee's version of events. When asked whether it is normal practice to talk to the employee about whom the complaint was made, Larson testified, "That wouldn't always be 100 percent accurate." Larson stated that it was generally part of the process to speak with the employee about the complaint, but that his actions might vary based on the situation. Larson could not recall any specific instance where he investigated but did not ask the employee for an explanation, other than with Clarke, but he "wouldn't say it's never happened before." Larson testified that he did not ask Clarke for his version of events because he saw that Clarke had another past customer complaint and that Clarke had received a final warning after his driving complaints. Larson decided that, based upon this totality of the circumstances, he would immediately terminate Clarke's employment.

16

Dana Brandt, the chief operating officer at Northwest at the time of Clarke's termination, testified that the general practice of Northwest when investigating a customer complaint is to get the driver's side of the story. In its supplemental answers to Clarke's interrogatories, Northwest indicated that it services vulnerable clients whose perception of the services they receive from Northwest may be influenced by major life experiences and that "[a]s a result, [Northwest's] customers can often be disgruntled and have difficulty with their equipment through no fault of [Northwest.] Because of this, [Northwest] does not immediately discipline any employee about whom a complaint is made, but rather investigates each complaint and determines whether corrective action is warranted."

Clarke has presented evidence that Northwest went against its "general practice" in failing to ask him his version of events in connection with the Windom complaint, but has presented no evidence that such a practice was required to be followed in every case. Moreover, Larson investigated the Windom complaint by following up with the clinic and the daughter of the customer and determined that their statements were credible. In light of the reported actions of Clarke and the resulting loss of a customer, we conclude that the deviation from Northwest's apparently unwritten general practice does not create a genuine issue of material fact regarding whether a discriminatory reason motivated the employer in terminating Clarke's employment.

Finally, Clarke argues that the district court failed to consider Trevino's statement in determining that he failed to meet his burden of showing that Northwest's stated reason for terminating his employment was pretext. However, the district court explicitly considered Trevino's statement in its pretext analysis, noted that its value was relatively

17

weak because of the multiple inferences required to regard the statement as evidence of discriminatory motive, and concluded that Clarke had failed to provide sufficient evidence to demonstrate that the stated reason was pretext for discrimination.

We agree with the district court that, while Trevino's statement provides some weak evidence of discriminatory motive, Clarke failed to present sufficient evidence that Northwest's nondiscriminatory reason was pretextual, given that Northwest presented evidence of issues with Clarke's work performance, Clarke failed to present evidence that Northwest had treated other employees more favorably, and Clarke received two complaints shortly before his termination, including one from a customer who complained to a referral source and terminated Northwest's services.

**Affirmed.**